CARPENTER *v.* HORACE MANN LIFE INSURANCE
CO., et al.

CA 86-195                                    730 S.W.2d 502

Court of Appeals of Arkansas
Division II
Opinion delivered May 20, 1987
[Supplemental Opinion on Denial of Rehearing June 24, 1987.*]

## ERRATA

*21 ARKANSAS APPELLATE REPORTS at page 112*

Detach at perforation, moisten the back, and paste over the first seven lines of the text on page 112 of *Lamb v. State:*

could not have validly arrested him as she had no jurisdiction on federal property.

██  Assuming that appellant is correct in his argument that he was illegally arrested, an illegal arrest is neither a bar to prosecution nor a defense to a valid conviction. *United States v. Crews,* 445 U.S. 463 (1980); *Webster v. State,* 284 Ark. 206, 680 S.W.2d 906 (1984); *Daley v. State,* 20 Ark. App. 127, 725

114

*Howell, Price, Trice, Basham & Hope, P.A.*, for appellant.

*Martin Law Firm*, by: *Thomas A. Martin*, for appellees.

MELVIN MAYFIELD, Judge. Appellant, Carey Carpenter, was the primary beneficiary of the will of Monica Johnson and the beneficiary, either directly or indirectly, as trustee of The High Foundation, of seven life and accident insurance policies totaling $145,000.00. Monica Johnson died in 1977 as the result of an automobile accident. This is an appeal by Carpenter from decisions of the chancery and probate courts holding that all the documents involved were executed by Monica while under undue influence exerted by Carpenter and, therefore, that she died intestate with her sole and only heir being her son Bryan Patrick Johnson; that the designation of Carey Carpenter and/or The High Foundation as beneficiaries of the life insurance policies was void; and that any proceeds from the insurance policies, interpled into the registry of the chancery court, should be paid to the Estate of Monica Johnson. We affirm.

Monica Johnson, nee Hubbell, was the oldest of six children. She was reared in Minnesota as a Catholic, attended parochial schools, and was considered by her family to be very religious. After finishing high school, she became a registered nurse. In 1965 she married Pat Johnson who converted to Catholicism but later professed to be an atheist. Monica and Pat had one child, a son, who was born about a year after their marriage. Monica

worked and put Pat through vocational school and college. In the early 1970s, they moved to Chicago where Monica began searching for "something more" in the spiritual realm. She met Carey Carpenter at a lecture early in 1973 when a nurse she worked with suggested she go hear him speak.

An immediate correspondence began between Carpenter and his wife and Monica. Carpenter professed to be a teacher, writer and counsellor. His doctrine is somewhat unclear from the record but appears to have involved delving into the metaphysical in an effort to get closer to God and included reincarnation, soul mates, and meditation. He apparently did not advocate the study of the Bible. He did advocate tithing, however, to support his work and The High Foundation, which was an organization he founded in 1966, and in her letters, Monica expressed a desire to tithe but an inability to do so because of resistance from her husband.

Carpenter's wife, Sherry, wrote letters to Monica in which she claimed that Carpenter was able to transmigrate, did not have to eat or perform other bodily functions, could heal himself and others, and had other supernatural powers. Sherry said Carpenter usually did not perform these acts openly because it took so much of his energy and, if people became aware of his powers, they would then focus on his miracles instead of his teachings. From testimony of his other followers, it appears that Carpenter and Sherry also convinced his "disciples" that he could control their lives from afar and, if they didn't want bad things to happen to them, they must give more and more of their money to him for his "work."

Carpenter owned a farm near Harrison where he lived with Sherry, a girl named Renee (who became his third wife after Sherry died in an automobile accident in 1980), and various other women who came and went. Sherry and Renee kept the house and garden while the other women worked, but all the earnings were given to Carpenter.

In December 1973, Monica received a letter from Carpenter which referred to an enclosed letter from Sherry and astrological charts for Monica, Pat and Bryan which Sherry had prepared. Carpenter stated, "I think you will find her to be a very capable counselor via astrology and intuition, . . ." In her letter Sherry refers to Bryan, then 8 years old, and states, "It might truly be

best for all concerned if he died young for he might well be reincarnated with a better motivation." In astrological charts for each of them, Sherry predicted increasing marital discord through 1974 and up to July 1975, at which time one of the charts has the entry, "Favorable period for success and satisfaction with achievements, good time to begin undertaking new friendships, promotion, . . ." The chart also predicted that Bryan would suffer many disappointments and that his death would most likely be tragic—possibly suicide.

As predicted, Monica and Pat's marriage deteriorated rapidly as Monica's desire to give Carpenter more and more money created severe problems. Monica returned to nursing in order to have her own money to give to Carpenter; and in 1973 and 1974, she gave Carpenter increasing amounts of her earnings. As a result, Pat began withholding more and more of his income from the family budget. In late 1974 and early 1975, letters between Monica and Carpenter reflect that she and Pat were having serious marital problems and that Carpenter was encouraging Monica to get a divorce and move to Arkansas to join his "family." In July of 1975, Monica and Pat were divorced. She gave custody of Bryan to Pat, and subsequently moved to Arkansas to live with Carpenter and his extended "family" and obtained a job at Yellville as a nurse. By this time she was giving Carpenter approximately 75% of all her earnings. In return, he provided her with a house in Harrison, utilities and a car. Monica spent her weekends at the farm helping with the children, gardening, cooking, and keeping house.

In 1976 and 1977, Monica purchased seven life and accident insurance policies, totaling $145,000.00 ($195,000.00, if the double indemnity clause were held to be effective). All except one were payable to either Carpenter individually or The High Foundation. The other policy was payable to Monica's estate. On April 12, 1977, Monica executed, in the office of a Harrison attorney, her "Last Will and Testament" in which she named Carpenter executor and principal beneficiary of her estate and left nothing to her son, then age 11, or to any of her other relatives.

In November 1977, Monica went to Denver, Colorado, to investigate the possibilities of opening an office there from which to teach Carpenter's philosophies and recruit more disciples for

him. She also applied for a nursing position at several of the Denver hospitals. While in Denver, Monica rented a car and drove to Vail, Colorado, where she intended to spend a few days resting. She wrote Carpenter on November 30, 1977, and complained that the car seemed to need a front-end alignment, and on December 1, 1977, the car was discovered about 100 feet off the roadway. Monica's purse, with money and credit cards intact, was found in the car, but an extensive search produced no trace of her. Her body was found by hikers in April 1978 near where her car had been found. It was determined that she died of exposure.

After Monica's death, Carpenter made demand on the insurance companies for payment of the policies as beneficiary, trustee for The High Foundation, or executor of Monica's estate. Pat Johnson notified the insurance companies of a claim on behalf of his and Monica's son, Bryan, and eventually seven lawsuits were filed plus a matter in probate court pertaining to the will that had been filed for probate. All suits were consolidated for trial and judgment was rendered in all the cases on September 30, 1985. The transcript consists of twenty-three volumes.

In addition to the evidence summarized above, the trial judge also heard the testimony of two psychologists who had reviewed all the letters between Monica and her parents and between Monica and the Carpenters; had reviewed the depositions of Carey Carpenter and several of his former disciples; and had also interviewed some of the witnesses and parties. Both psychologists concluded that Monica had a very dependent personality, was searching for a father figure to care for her and that Carpenter fit her needs perfectly. They pointed to letters in which Monica expressed her feeling that she was part of Carpenter's "family" after her divorce and evidence that Carpenter treated her as such. Both testified that it was not their belief that Carpenter had actually, knowingly attempted to extort money from Monica or other women. It was their opinion that he was not intentionally a "con artist" but that his teachings had this effect on gullible women and he did nothing to dissuade their belief in him and, in fact, encouraged them to give him money for his "work" and free him from the necessity of holding a job so he could devote his entire time and energy to his teaching and writing. Both psychologists concluded that because of Carpen-

ter's mental hold on Monica, the veiled threats that if she left him something terrible might happen to her, and because she believed he was Jesus Christ on earth and could will things, both good and bad, to happen to people, she was not free to fully exercise her own independence and to think for herself. Thus, they concluded that when Monica made Carpenter and/or The High Foundation the beneficiary of her will and insurance policies, she acted irrationally and under the undue influence of Carpenter.

On appeal, Carpenter first argues that the order on September 3, 1981, admitting Monica's will to probate, was res judicata on the issue of the validity of the will and, therefore, his motion for summary judgment should have been granted on that issue. Summary judgment is proper only when there is no genuine issue as to any material fact. *See* ARCP Rule 56.

An order dated September 3, 1981, entitled "Agreed Order Probating Will and Appointing Personal Representative," provides in pertinent part:

1. That there has been filed a notice of proceedings to probate the decedent's Will by Garvin Fitton, on behalf of Bryan Patrick Johnson, a minor, and no additional petition has been filed for appointment of a personal representative herein. That the parties agree that the Petition of Carey Carpenter and the Cross-Petition on behalf of Bryan Patrick Johnson may be heard and decided forthwith.

. . . .

4. That the instrument offered for probate was executed in all respects according to law and has not been revoked; that a petition contesting such Will has been filed herein in behalf of the child of Decedent.

5. That Petitioners have agreed that First Bank and Trust Co. of Mountain Home, Arkansas, an Arkansas banking corporation, insured by the FDIC, should serve as the Administrator with Will Annexed.

IT IS THEREFORE CONSIDERED, ORDERED AND ADJUDGED that the proffered instrument be, and hereby is, admitted to probate as the Last Will of Decedent; that First Bank and Trust Co. of Mountain Home,

Arkansas, a banking corporation insured by the FDIC, be, and hereby is, appointed to serve as Administrator with Will Annexed herein without bond, and that Letters of Administration be issued to said administrator.

This order is signed by Boone County Probate Judge Stephen W. Luelf and is approved as to form by Thomas D. Ledbetter, attorney for Carey Carpenter, and Garvin Fitton, attorney for Bryan Patrick Johnson.

The appellant argues that the above order admits the will to probate, and that Ark. Stat. Ann. § 62-2120 (Repl. 1971) requires the probate judge to find that the testator was competent and acting without undue influence, fraud or restraint before admitting a will to probate. Thus, it is argued, these findings were made, no appeal was taken from them, and these issues were res judicata; therefore, appellant's motion for summary judgment should have been granted. The trial judge overruled the motion, however, and held that the express language of the above order admitted the will "conditionally," that the issues involved in the will contest were reserved, and that the conduct of the parties in continuing to participate in the probate case by filing pleadings and briefs belied the assertion that the order admitting the will to probate disposed of the probate case once and for all.

From our review of the record and order in this case, we cannot say the court's ruling that the order admitting the will to probate did not dispose of the will contest was clearly erroneous. This is especially true in light of the provisions of Ark. Stat. Ann. § 62-2015 (Repl. 1971) which allows the court to vacate or modify its orders until the time for appeal after the final termination of the administration of an estate has elapsed. Thus, even if the court had felt the order was res judicata on the validity of the will, it could have vacated its September 3 order because the probate case was still open. It seems clear that the order recognized that the will was being contested and it was admitted to probate conditionally, while expressly reserving for a future trial on the merits the issue of who would ultimately receive the benefits of the estate. We find no error in the court's overruling of appellant's motion for summary judgment.

Appellant's next argument is that the court erred in not finding that Bryan Johnson lacked privity to challenge or modify

the insurance contracts. Contending Bryan was not a party to any of the contracts, appellant asserts he lacked standing to challenge the validity of the designation of beneficiary on the insurance policies. However, an agreed order dated October 29, 1982, and signed by the judge on November 24, 1982, provides:

1. That Carey Carpenter and Bryan Patrick Johnson are adversaries asserting conflicting interests in this Estate, based on allegations of the invalidity of the Will of Monica Catherine Johnson, deceased, and asserting conflicting interests in the proceeds of certain insurance policies on the life of Monica Catherine Johnson, deceased.

2. That the several positions of the adversaries, Carey Carpenter, on the one hand, and Bryan Patrick Johnson, on the other are adequately represented by counsel of their individual choosing.

3. Both the attorneys for Johnson and the attorney for Carpenter agree that First Bank & Trust Co., the personal representative herein, has at all times prior hereto acted prudently and responsibly in its capacity as personal representative. Said attorneys also agree that the attorneys for Johnson and the attorney for Carpenter could properly and efficiently represent their respective positions in the suits herein pending; and that First Bank & Trust Co. has no responsibility in the prosecution of any claim, action or demand herein pending nor for the prosecution of any claim on behalf of the estate.

4. That First Bank & Trust Co. has been appointed Administrator of the Will annexed as an accommodation to the Court and is to be a mere "stakeholder" should the litigation now pending herein, or elsewhere, result in the acquisition of any assets by the Estate.

IT IS THEREFORE THE JUDGMENT, ORDER, AND DECREE of this Court that the Administrator with the Will annexed, the said First Bank & Trust Co., shall have no personal responsibility or liability save and except the management of any assets which might ultimately come into its hands and possession by virtue of the several lawsuits now pending or which may hereinafter be brought

relating, directly, or indirectly, to the death of Monica Catherine Johnson, or otherwise.

The final judgment in this case states that the content of an off-the-record conversation between the court and all attorneys was noted in the record by the court and amounted to an adoption of the pleadings of Bryan Johnson by the Estate; and that no objection was made on behalf of appellant. The final judgment also states that the parties had agreed that the issues raised were in actuality between Carpenter and Johnson and that the attorneys for those parties could adequately develop those issues and that the Personal Representative (The Bank) would be a stakeholder only and not an active participant. The judgment states that this agreement was set out in an order dated October 29, 1982, and signed November 24, 1982, therefore, Carpenter's argument at trial that Bryan lacked standing to challenge the beneficiary designations in the insurance contracts was moot. We think the court's judgment represents a fair reading of the above order and we cannot say the court's decision that appellant's argument was moot is clearly erroneous.

Finally, appellant argues that the findings of fact by the chancellor are clearly against a preponderance of the evidence. Appellant recounts much of the evidence and contends that it shows only that Monica felt great love for Carey and Sherry Carpenter and wanted to leave her bounty to Carpenter to support his work. He contends the chancellor's findings that Monica was in a "weakened mental condition," that she had made no provisions for her eleven-year-old son, and that the presumption of undue influence was not overcome by the evidence are clearly against the preponderance of the evidence. In summary, he contends the finding that Monica was unduly influenced to make Carpenter the beneficiary of her will and insurance policies was clearly erroneous.

Undue influence which avoids a will is not the influence which springs from natural affection or kind offices, but is such as results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property, and it must be specially directed toward the object of procuring a will in favor of particular parties. *Rose* v. *Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984). Whether a will was procured by

undue influence is a question of fact for the trier of fact. The evidence, whether direct or circumstantial, should be permitted to take a very wide range. The nature of the relations and dealings between the testator and the beneficiaries, the extent of the property of the testator, his family connections, the claims of particular persons upon his bounty, the situation and mental condition of the testator, the nature and contents of the will itself and the circumstances surrounding its execution are among the numerous facts from which fraud and undue influence may be inferred or disproved. *Sanger* v. *McDonald*, 87 Ark. 148, 112 S.W. 365 (1908). Where the provisions of a will are unjust, unreasonable and unnatural, doing violence to the natural instinct of the heart, to the dictates of parental affection, to natural justice, to solemn promises, and to moral duty, such unexplained inequality is entitled to great influence in considering the question of testamentary capacity and undue influence. *Brown* v. *Emerson*, 205 Ark. 735, 170 S.W.2d 1019 (1943). Evidence of an unnatural disposition of his property by a testator is admissible to show a mind easily susceptible to undue influence. *Howell* v. *Miller*, 173 Ark. 527, 292 S.W. 1005 (1927).

■ Furthermore, as stated in *Tobin* v. *Jenkins*, 29 Ark. 151 (1874):

> And as regards undue restraints, it may be proper to remark that it is not necessary that the mind should act under influences at the time brought to bear, or then employed, but they may be such as to have at a previous time been so fixed and impressed as to retain their controlling influence at the time the act is done. Nor is such restraint necessary to be effected by force or intimidation; for it has been held, upon authority, that if the mind acts by force of long training to submission, so that the will of another is adopted for its own, and without reflection, the party thus influenced is incompetent to contract.

29 Ark. at 157-58.

Finally, as observed by Judge McHaney in *Hyatt* v. *Wroten*, 184 Ark. 847, 43 S.W.2d 726 (1931):

> Undue influence is generally difficult of direct proof. It is generally exercised in secret, not openly, and, like a

snake crawling upon a rock, it leaves no track behind it, but its sinister and insidious effect must be determined from facts and circumstances surrounding the testator, his physical and mental condition as shown by the evidence, and the opportunity of the beneficiary of the influenced bequest to mold the mind of the testator to suit his or her purpose.

184 Ark. at 853.

■ Appellant directs us to isolated evidence in the record which, he contends, supports his arguments that Monica acted only out of natural love and affection for him, his work, and his family. He insists he never encouraged her to make a will or buy insurance naming him as beneficiary. However, without repeating the evidence in any greater detail than has already been done, suffice it to say that a consideration of the record as a whole supports a finding that appellant, whether intentionally or not, was a very skillful manipulator of emotionally immature, needy, dependent women who were looking for someone to control their every action and who had not found that need fulfilled by the husband or father in their lives. The record supports a finding that there was a systematic alienation of Monica Johnson from her husband, son, parents, and siblings, and replacement in her affections of the appellant, claiming to be Christ on earth, and that this resulted in his virtual enslavement of her through the manipulation of her mind and emotions. The record also supports a finding that the ultimate result was that Monica Johnson lacked the mental capacity to make a will or designate insurance beneficiaries as her own agent, free of the influence of appellant. We cannot say that the decision of the trial judge was clearly against the preponderance of the evidence.

Affirmed.

CRACRAFT and COOPER, JJ., agree.

Supplemental Opinion on Denial of Rehearing
Delivered June 24, 1987

MELVIN MAYFIELD, Judge. The appellant's petition for rehearing quotes a sentence from our opinion and contends it shows that we have misconstrued the Probate Code. The sentence quoted states: "This is especially true in light of the provisions of Ark. Stat. Ann. § 62-2015 (Repl. 1971) which allows the court to vacate or modify its orders until the time for appeal after the final termination of the administration of the estate has elapsed." Appellant points out that the statute contains the following limitation on the stated right to vacate or modify: "except that no such power shall exist . . . to set aside the probate of a will after the time allowed for contest thereof." Appellant's petition then states that the will in this case was admitted to probate on September 3, 1981, and that Ark. Stat. Ann. § 62-2114(b)(2) (Repl. 1971) would require a contestant of the will to file his objections within six months after the first publication of the notice of the admission of the will to probate. Since that period expired long before the judgment holding the will void was entered on September 30, 1985, the appellant claims the Septem-

ber 3, 1981, order admitting the will to probate was final and could not be set aside on September 30, 1985.

■ We concede that the sentence quoted in appellant's petition for rehearing is unclear. It was meant to point out that because a contest of the will had already been filed at the time the will was admitted to probate on September 3, 1981, there was no time period in which the contest had to be filed; therefore, the court could vacate or modify its order admitting the will to probate, for good cause, at any time within the period allowed for appeal after the final termination of the administration of the estate.

■ However, regardless of the clarity of the sentence, the opinion held that the will contest which was filed prior to the order of September 3, 1981, was not heard until many months later and was not decided until the trial court entered its judgment on September 30, 1985. Thus, there was no final order in the will contest until that date; the will contest was not decided by the September 3, 1981, order; and appellant's motion for summary judgment contending that the 1981 order was res judicata of the will contest was properly overruled by the trial court.

CRACRAFT and COOPER, JJ., agree.