2011 Ark. App. 47

**Julia Laney MACHEN, Appellant**

v.

**Billy Randall MACHEN, Appellee.**

**No. CA 10–561.**

Court of Appeals of Arkansas.

Jan. 26, 2011.

Rehearing Denied Feb. 23, 2011.

---

Robert Steven Tschiemer, Mayflower, David Preston Price, Magnolia, for appellant.

Stephen R. Crane, Magnolia, for appellee.

LARRY D. VAUGHT, Chief Judge.

This case involves a family-settlement agreement. Billy Ray Machen, who died on May 20, 2006, was survived by his wife, appellant Julia Machen, and two sons, appellee Billy Randall Machen (Randy) and Steven Ray Machen. On July 12, 2006, Julia filed a petition to probate Mr. Machen's 1996 will, which gave a life estate in his real property to Julia, with certain restrictions, and the remainder to Randy. It made the following provisions for his personal property:

2. I give and bequeath to my son, Billy Randall Machen, the sum of $10,000.00 to be paid out of my estate after the payment of my debts.

3. I give and bequeath to my son, Billy Randall Machen, as trustee for my grandchildren born of Billy Randall Machen, the sum of $20,000.00 to be retained, managed, and distributed by him under the provisions of paragraph VI. of this will. If Billy Randall Machen does not accept the duties as trustee or ceases to act as trustee, for any reason, then I direct that my wife, Julia Laney Machen, act as trustee. If Billy Randall Machen and Julia Laney Machen do not accept the duties of trustee or cease to act as trustee, then I appoint the Trust Department of the Farmers Bank & Trust Company of Magnolia, Arkansas, to act as trustee. I direct that no bond be required of any trustee for their actions in this capacity.

4. I give and bequeath to my beloved wife, Julia Laney Machen, all cash on hand and deposits in bank accounts in either my name, singularly, or jointly in mine and my wife's name, all furniture, household contents, furnishings, appliances, lawnmowers, vehicles, and any three guns, and any tools which she may choose.

5. All the rest and remainder of my tangible personal property, I give and bequeath to my youngest son, Billy Randall Machen.

In paragraph VI, the will provided for a testamentary trust for the benefit of Randy's children.

On November 13, 2007, Randy filed a petition opposing the probate of the 1996 will and the appointment of Julia as executrix, stating that Mr. Machen had revoked the will and had made changes on it indicating his intent to alter it. He attached a copy of the will with the changes made by Mr. Machen, which was signed and dated by Mr. Machen, Julia, and Randy. The changes increased Randy's bequest to $100,000 and his children's bequest to $200,000. Randy also stated that Julia had the original revised document in her possession and asked the court to order her to produce it.

On March 3, 2008, the probate court held a hearing on whether the 1996 will, or the marked-up version of that will, should be admitted to probate and whether Julia should be appointed executrix. Neither party could produce an original of the documents. Randy testified that his father made the handwritten changes on the will and signed it as Randy was driving him and Julia, who was in the back seat of the car, to a neurologist in Tyler, Texas, on November 11, 2005. Randy said that, when they were in the car, his father had told him that his wealth had increased since he had made the will and that he wanted to give Randy and the grandchildren more than what he had originally bequeathed them; that his father also changed the will to provide that Randy would receive his tools, guns, and lawn-maintenance equipment; and that Julia made no objection. Randy stated that, after his father made the changes, and signed and dated the will, he put it back into his briefcase; Randy did not see it again until the day after his father died. He said that, the day after the funeral, Julia produced the document and told Randy that she wanted Mr. Machen's will to be carried out and asked Randy to sign and date it with her as if they had signed it on the day that Mr. Machen had made the changes.

Randy stated that, after he and Julia had signed the marked-up document, Julia changed her mind; she told him later that she did not think the children should receive more than $20,000 each, but the next

day, she said that she would do exactly what Mr. Machen had wanted. A month later, he said, she told him that she had learned that grandchildren normally do not get that much. Randy testified that two years before trial, Julia had given each of his children $10,000, expressly stating that they were Christmas gifts and had nothing to do with the estate. He said that, although he had received $97,000 from his father's retirement account because Julia had disavowed some funds, she had not transferred $200,000, or even $20,000, to him as trustee for the children. He stated that he had no doubt as to what his father had wanted to do and asked that his father's last wishes be enforced.

Julia testified that, although Mr. Machen had made changes to the will, he had not made them in the car on the way to the neurologist. She said that in late 2004 or early 2005, she left her husband at Randy's office in Little Rock while she went to a doctor's appointment; on the way home that night, Mr. Machen produced the 1996 will with "some scratching on it"; he told her that Randy wanted him to increase his bequest to $100,000, which, she replied, was fine with her. She said that her husband added that he thought $200,000 was too much to leave the girls; after she responded that it was his decision, he left that provision as it was and later told her that he was not going to make that change.

Julia said that, although Randy did go to Tyler with them for Mr. Machen's brain surgery for Parkinson's disease, it was on October 4. She said that Mr. Machen asked her:

"Guess what he just asked me?" and I said, "What?" and he says, "He wants to know where the new will is." I said, "Oh, really?" and he says, "Yeah." He says, "I'm going to get out the will I scratched through," and he says, "we're all going to sign it," and he said, "that should make Randy happy." I said, "Whatever."

Julia said that she and Mr. Machen signed the document the morning before he went into surgery; that, although Mr. Machen was competent and knew what he was doing, he wrote on the top of the document that he was replacing the 1996 will to satisfy Randy. She said that he made other changes, but there was a page missing; although he had written on the back of page 2, it was not copied. She denied having the original. She said that she did not actually witness her husband sign the document and did not know if the handwriting on it was his, but admitted signing it herself. She also admitted disavowing $100,000 to give to Randy because of the amended paragraph 2.

Julia said that she and Mr. Machen had held all of their bank accounts jointly; that there was a little over a million dollars in Mr. Machen's retirement account when he died; that she was the primary, and Randy was the contingent, beneficiary of the retirement account; that, prior to Mr. Machen's death, he set nothing aside; and that she had set up savings accounts of $10,000 for each of the girls, in addition to the $10,000 certificates of deposit that she gave them, to carry out the wishes of her husband pursuant to the original will.

Randy's attorney stated that, after hearing the testimony that day, he thought that they actually had a family-settlement agreement that needed to be tried in another court. The court stated that it would appoint Julia as executrix and directed her to file an inventory within sixty days. Julia's inventory listed a retirement account with a value of $321,133; another retirement account valued at $706,412; and a bank account valued at $104,604, of which she was a joint owner. Julia stated that she had disclaimed $100,000 of the

cash and had delivered it, along with his father's diamond wedding band and a watch, to Randy.

On January 5, 2009, Randy filed a civil complaint on behalf of himself and his children against Julia, individually and as personal representative, asserting that on November 11, 2005, Mr. Machen had made handwritten changes to his 1996 will that included increasing his bequest from $10,000 to $100,000 and the bequest to his children from $20,000 to $200,000. He also stated that the changes included a provision that he receive his father's tools, lawn-maintenance equipment, and vehicles. He asserted that Mr. Machen and Julia had created an enforceable contract including those items, which Julia had breached by refusing to make the distribution to his children. He stated that, after Mr. Machen's death, Randy and Julia met and discussed settlement of the estate, and agreed to the changes in the will expressed above; however, Julia had only partially performed by distributing the agreed amount to Randy. He asked the court to order specific performance of the family-settlement agreement.

On May 15, 2009, Randy filed a motion to consolidate the probate and civil proceedings. The circuit court held another hearing on the consolidated cases on August 28, 2009. Randy testified that he recognized the signature on the bottom left-hand corner of the will with the handwritten changes as his father's; that he saw the original when his father made those changes; and that he received only a copy of it. He stated that Julia had possession of the original after his father's death, and that he last saw it on the day after the funeral. He testified:

> We met in the kitchen at the table. She pulled out the will and she said, "I want you and the kids to get exactly what your father wanted.... [W]e were there when he made those changes and I want us to sign it and date it as if we were there that day." ... Because she wanted it to carry forward exactly what he wanted in the will, she wanted his ... handwritten changes to take place.... She had no problem agreeing with the will.... We signed it and dated it.... She said that we needed to backdate it the day he made those changes, because we were there.

Randy stated that they agreed to the changes that his father had made in the will, and that, although he had thought that Julia would carry out his father's wishes as his wife and executor, she had not done so.

Randy again testified that he first became aware that his father was going to make changes to his will as Randy was driving them to Tyler. He said that his father stated that he wanted to make some changes to the will and leave Randy and the children more money than he had originally provided. Randy stated that his father's signature was already on the will and that his father described the changes he was making as Randy drove; his father wanted to give him $100,000, instead of $10,000, and his children $200,000, instead of $20,000. Randy said that Julia agreed as long as she was taken care of. After the funeral, he said, Julia wanted to go along with the changes, and as far as he was concerned, they had an agreement; a month or two later, however, she expressed her doubts about giving the children $200,000. As time went by, he said, Julia informed him she thought that Randy should get the $100,000, in accordance with his father's changes to the will, but that she was not going to give the increased amount to the children.

Julia conceded that her husband had made changes to his will and verified that the signature on the bottom left-hand cor-

ner of the marked-up document was his and that a signature on the bottom right-hand corner was hers, but denied having agreed to the changes herself. She did not know the location of the original will. She stated: "Billy wanted to get Randy off his back about the new will and I would have done anything ... to keep Billy from being upset the morning before major brain surgery." She said that her husband told her that he knew why Randy had come for the surgery, because Randy had asked that morning if he had the will done. She testified that she told her husband to do what he wanted, and that he told her that he would scratch through the will, which they would all sign, and that "should make Randy happy." She acknowledged signing the document although she disagreed with the changes.

Julia said that she had given Randy $100,000 because she felt sorry for him and wanted him to receive more than $10,000. She admitted that her husband had written $200,000 and signed the document containing that change, but added that he thought $200,000 for the children was too much. Julia testified that she had been unable to find the original will and said that, after the March hearing, she recalled that Randy had spent the entire day after the funeral in her husband's office and had left with some folders that she had given him. She said that the original will was in a folder behind her husband's desk; two days later, it was not there. She acknowledged making copies after they signed it and giving Randy a copy. Julia denied post-dating the document after the funeral or even going to Tyler on November 11, 2005.

Stephanie Machen, Randy's ex-wife and the mother of his daughters, testified that she had stayed in contact with Julia and had spoken with her about the agreement. She stated that Julia had said that Mr.

Machen had wanted to make changes, because he was hoping that Randy would come and visit more often, and that she had agreed, as long as she was taken care of. Stephanie said that she knew that they had changed the document to $100,000 for Randy and to $200,000 for the girls. She said that Julia had intended to follow Mr. Machen's wishes by taking care of the grandchildren.

Randy denied taking anything out of his father's house without Julia's knowledge and said that he last saw the original of the marked-up will on the way to Tyler, and that he did not try to talk his father into making the changes. He stated:

> [A]t one time he came up for surgery in Little Rock.... He brought some documents to me in a briefcase. He says, "I want you to have this in case something happens during my surgery, because I don't trust Julia".... [H]e put the suitcase in the closet, and after the surgery he took it home ... and everything was fine.

The circuit court entered an order noting numerous contradictions between Randy's and Julia's testimony as to where and when the changes were made to the document and when it was signed and dated. It concluded that Mr. Machen, Randy, and Julia had entered into a family-settlement agreement:

> 6 ... But what was the agreement? The simple answer is that Randy Machen was to receive $100,000 for himself and $200,000 as trustee for his two children. The real answer is that the parties agreed to amend the decedent's will and to honor the amended version as decedent's Last Will and Testament. Regardless of the motives of Mr. Machen and regardless of when and where he made the changes to his original will, it is undisputed that he made the changes and Randy and Julia signed the

document bearing the changes. This finding by the court does not, however, resolve all the issues in this case.

7. Despite having made changes to the division of his assets in his will, Billy Ray Machen failed to take the necessary steps to insure that the funds would be available to pay to Randy. All of his money assets passed to Julia by right of survivorship, and his will dealt with his real property. Despite this fact, after Mr. Machen's death, Julia disclaimed her interest in a $100,000 retirement account to which she was entitled by right of survivorship so that Randy could receive these funds; this action by her is also clear evidence that there was an agreement that Randy was to receive $100,000 from his father's estate.

8. It is entirely possible, if not probable, that Mr. Machen, who appears to have been an astute businessman who sought and received financial/investment advise [sic] from David Ashby, saw no need to either change his will or change his financial records because an agreement had been reached and signed by those affected by the changes. Again, and as noted in the preceding paragraph, the agreement could be consummated by Julia simply giving those assets to the respective beneficiaries, just as she did with the $100,000 transfer to Randy. She could have, and still can, make a similar transfer to Randy as trustee for his two children in the amount of $200,000. The court concludes that Randy Machen, as trustee for his two children, should have judgment against Julia Machen in the amount of $200,000.

9. The court is not unmindful of the case of *Walpole v. Lewis* [254 Ark. 89], 492 S.W.2d 410 (1973), a case relied on heavily by Julia Machen. Unlike the facts in the *Walpole* case, the agreement reached by Mr. Machen, Julia, and Ran-

dy did not change, diminish, or alter the rights of anyone interested in the estate except Julia and Randy. Julia and Randy simply agreed to distribute the assets of Mr. Machen's estate in a manner different than his original, unaltered will.

The court concluded that Mr. Machen had changed the amount of money that Randy was to receive, individually and as trustee for his two children; that he had also made changes to the division of other personal property; and that those changes were part of the family-settlement agreement. It ordered the parties to divide those assets in accordance with the agreement; awarded judgment to Randy for $200,000; and directed that the estate would continue subject to the requirement that its assets be divided in accordance with the agreement. Julia then pursued this appeal.

 Our standard of review on appeal from a bench trial is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Cook v. Cook*, 2010 Ark.App. 758, 378 S.W.3d 275. Disputed facts and determinations of the credibility of witnesses are within the province of the factfinder. *Id.* at 2, 378 S.W.3d at 277.

Julia characterizes the issue before the trial court as follows: "whether the original validly executed Will of 1996 in this case took precedent [sic], or whether handwritten changes to a copy of it, without meeting authenticity or statutory testamentary requirements under Ark.Code Ann. §§ 28–25–103 [ (Repl.2004) ] and 28–40–117(b) [ (Repl.2004) ], supplanted the Will." At length, she discusses the ways in which the document with the handwritten notes on it did not satisfy these statutes. She argues that the handwritten notes evidenced either an attempted inter vivos gift

or a failed testamentary disposition, citing Randy's testimony that his claim was against the estate to "enforce" his father's "last wishes." Julia argues that she never agreed to increase Randy's portion from $10,000 to $100,000 or to increase his children's portions from $10,000 to $100,000 each and that Randy procured the changes by undue influence. She adds that, while Randy testified that she signed the document in her capacity as the decedent's wife and executrix of the estate, she was not actually appointed to the position of executrix until 2008. This entire section of the brief, except for the topic of undue influence, which we address below, is irrelevant to the actual ruling by the trial court: that the parties entered into a family-settlement agreement, which is not a testamentary disposition.

■ Before construing the marked-up will, the trial court had to first determine what it was. Rather than deciding that the document was a failed testamentary disposition or gift, it ruled that it reflected the terms of a family-settlement agreement. In attempting to discern the real character of the transaction, the trial court correctly considered all of the written and oral evidence and properly focused on the intent of the parties in the light of all attendant circumstances. *See Bright v. Gass,* 38 Ark.App. 71, 831 S.W.2d 149 (1992). In carrying out the true intent of the parties, the trial court properly looked beyond the mere form in which the transaction was clothed and considered the conduct of the parties, and their relations to one another and to the subject matter. *Id.* at 78, 831 S.W.2d at 154. Conclusions concerning the true intent of the parties primarily involve issues of fact, and the trial court's decision on such issues will not be reversed unless the findings are clearly erroneous. *Id.,* 831 S.W.2d at 154.

Julia argues that she could not have entered into a valid family-settlement agreement as a representative of the estate because she had not yet been appointed executrix, citing Randy's testimony that she entered into this agreement as the decedent's wife· and as executrix of the estate. Her argument misses the point. Randy's claim is against Julia, who personally holds the legal rights to all of the cash and has possession of the other personal property, and who is bound by the trial court's order individually, not just as executrix. Under this point, Julia also notes that Randy did not file a claim against the estate, citing the non-claim statute and the statute of frauds. We do not address these arguments because they were not developed below and the trial court did not rule on them. *See Foster v. Foster,* 2010 Ark.App. 594, 377 S.W.3d 497. In any event, they are irrelevant to the family-settlement agreement, which Julia signed.

■ Julia argues that the handwritten changes to the will were simply "scribblings" and did not amount to a family-settlement agreement; that the purported family-settlement agreement's terms were uncertain; that she had no intent to enter into a contract; that there was no "meeting of the minds"; and that the parties only negotiated and failed to reach a final agreement. A "meeting of the minds" does not depend upon the subjective understanding of the parties, but instead requires only objective manifestations of mutual assent for the formation of a contract, which, we hold, were present in the case at bar. *Thurman v. Thurman,* 50 Ark.App. 93, 900 S.W.2d 221 (1995).

■ Family-settlement agreements are favorites of the law. *Green v. McAuley,* 59 Ark.App. 114, 953 S.W.2d 66 (1997). Such agreements should be encouraged where no fraud or imposition is practiced. *Id.* at 118, 953 S.W.2d at 68. Our standard

of review for contracts in general applies to family-settlement agreements. *Poff v. Peedin*, 2010 Ark. App. 365, 374 S.W.3d 879. Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation. *Id.* at 4, 374 S.W.3d at 881. The determination of whether ambiguity exists is ordinarily a question of law for courts to resolve. *Id.*, 374 S.W.3d at 881. When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine, and it is the court's duty to construe the writing in accordance with the plain meaning of the language employed. *Id.*, 374 S.W.3d at 881. The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. *Id.*, 374 S.W.3d at 881. We must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. *Id.*, 374 S.W.3d at 881. The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties viewed it. *Id.*, 374 S.W.3d at 881. It is a well-settled rule that the intention of the parties to a contract is to be gathered, not from particular words and phrases, but from the whole context of the agreement. *Id.*, 374 S.W.3d at 881. The court is to give great weight to the construction of the contract given to it by the parties, and it may look to the conduct of the parties to determine their intent. *Id.*, 374 S.W.3d at 881.

Julia argues that Randy failed to prove the agreement because a page was missing. We disagree. The only part of the agreement that was in dispute was established by the proof, and it was apparent that the parties did not consider these particular changes to be dependent upon the other terms of the agreement. *See Thurman*, 50 Ark.App. at 96, 900 S.W.2d at 223. Julia also contends that the parties did not reach an agreement because Randy gave no consideration. Again, we disagree; the parties' motive to amicably settle the estate constituted sufficient consideration for a family-settlement agreement. *Green*, 59 Ark.App. at 118, 953 S.W.2d at 68. The supreme court has made it clear that little, if any, consideration is required to enter into a valid family-settlement agreement:

> [I]t is not essential that the strict mutuality of obligation or the strict legal sufficiency of consideration—as required in ordinary contracts—be present in family settlements. It is sufficient that the members of the family want to settle the estate: one person may receive more or less than the law allows; one person may surrender property and receive no *quid pro quo*.

*Pfaff v. Clements*, 213 Ark. 852, 857, 213 S.W.2d 356, 359 (1948); *accord Jones v. Balentine*, 44 Ark.App. 62, 866 S.W.2d 829 (1993). The motive in such cases is to preserve the peace and harmony of families; the consideration of the transaction and the strict legal rights of the parties are not closely scrutinized in such settlements. *Id.* at 71, 866 S.W.2d at 834.

The topic of consideration is relevant to Julia's contention that appellee coerced his father into making the changes and her into agreeing with them. The burden was upon Julia to establish that this occurred. Ordinarily, the burden is upon one who attacks such a transaction to prove that the donor was unduly influenced. *Jones*, 44 Ark.App. at 75, 866 S.W.2d at 836. A different burden of proof arises when it is shown that a confidential relationship existed between the donor and a dominant donee. *Id.*, 866

S.W.2d at 836. Relationships deemed to be confidential are not limited to those involving legal control; they also arise whenever there is a relation of dependence or confidence, especially confidence that springs from affection on one side and a trust in reciprocal affection on the other. *Id.* at 75–76, 866 S.W.2d at 836–37. In addition to proving the existence of a confidential relationship, a party challenging such a transaction must also show that the donee occupied such a superior position of dominance or advantage as would imply a dominating influence over the donor. *Id.* at 76, 866 S.W.2d at 837. Each case must be determined on its own facts. *Id.,* 866 S.W.2d at 837. Whether undue influence occurred is a question for the trier of fact. *Id.,* 866 S.W.2d at 837; *Carpenter v. Horace Mann Life Ins. Co.,* 21 Ark.App. 112, 730 S.W.2d 502 (1987). There was no evidence that Mr. Machen was dependent upon Randy or that Randy occupied a position of dominance over him. We hold that Julia did not establish that Randy exerted undue influence on his father to make the changes or on her to enter into the agreement. *See Green,* 59 Ark.App. at 118, 953 S.W.2d at 68.

■ The parties' signatures on Mr. Machen's marked-up version of the will indicated their mutual intent to enter into a binding agreement. *Id.,* 953 S.W.2d at 68. The essential terms of the family-settlement agreement were clear to Mr. Machen, Julia, and Randy: from the money in Julia's hands after Mr. Machen's death, Randy would receive $100,000 individually and $200,000 for his children. There is no question that all of them were competent to enter into this agreement or that they all signed it. Her stated desire to avoid turmoil and to prevent her husband from getting upset before his surgery was sufficient consideration for her agreement to follow Mr. Machen's wishes. Julia's testimony, in fact, supported Randy's version of what the important changes were to be; their disagreement over the details about when and where they signed the document were not significant. Julia asserts that her disavowal of $100,000 to Randy, her $10,000 gifts to the children, and her establishment of the savings accounts for the children were acts of charity and not evidence of a family-settlement agreement. As discussed above, the conduct of the parties was evidence of their intent and was entitled to be afforded great weight by the trial court. *Poff,* 2010 Ark.App. 365, at 2, 374 S.W.3d at 880. Julia's actions indicated her recognition of the family-settlement agreement; as time went by, she apparently changed her mind about giving the grandchildren so much money.

Affirmed.

PITTMAN and GRUBER, JJ., agree.