2011 Ark. App. 381

**PO–BOY LAND COMPANY, INC., et al., Appellants**

v.

**Kenneth MULLINS, James Stinson, and Sam Tyson, Appellees.**

No. CA 10–1249.

Court of Appeals of Arkansas.

May 25, 2011.

Charles Maxfield Walker, Hope, for appellant.

James H. Pilkinton, Jr. and Nathan M. Norton, Jr., Little Rock, for appellee.

JOHN B. ROBBINS, Judge.

Appellant Po–Boy Land Company, which is a Hempstead County hunting club ("the Club") appeals from a partial summary judgment in favor of appellees Kenneth Mullins, James Stinson, and Sam Tyson.[1] Appellees are former members of the Club who filed suit in 2006 for wrongful expulsion, seeking dissolution of the Club due to the directors' oppressive conduct. The court granted their requested relief, and the Club filed this appeal. Based on our review of the affidavits, corporate papers, and other matters considered by the circuit court, we conclude that summary judgment was inappropriate due to the existence of numerous issues of material fact. We therefore reverse and remand the court's order.

The Club was formed in 1993 with the sole asset of 2000–plus acres in Hempstead County. It established itself as a closely held corporation, offering just fifteen shares of stock at $103,060 per share. Appellees Mullins and Stinson were original shareholders, and appellee Tyson later purchased his share in 1994. Stinson also acquired two additional shares during the 1990s.

The events leading to this lawsuit began in the fall of 2004 when the Club received information that Stinson wanted to sell one of his shares to a Mr. McQueen for $212,000, and that Tyson wanted to sell his share to a Mr. Clay for the same price. Neither McQueen nor Clay were current shareholders with the Club. Mullins, who attended the meeting with Tyson's and Stinson's proxies, provided the membership with details of the transactions and, according to Club president John Hearnsberger, stated that he had advised Stinson and Tyson on the sales price. During the meeting, Hearnsberger reminded his fellow members that the Club's by-laws gave it the right of first refusal to buy the shares.[2] The members expressed interest in this possibility, and the matter was referred to the Club's board of directors.

On October 9, 2004, the board voted to acquire Tyson's and Stinson's shares at the $212,000 price. Mullins, who was a board member, voted against the purchases. The board also decided (with Mullins ab-

1. We dismissed a prior appeal because the partial-summary-judgment order did not contain a proper Ark. R. Civ. P. 54(b) certificate to permit an immediate appeal. *Po–Boy Land Co. v. Mullins*, 2010 Ark. App. 709, 2010 WL 4254501. The circuit court subsequently entered an amended order and certificate with specific factual findings as to why there was no just reason to delay the appeal. This certificate complies with Rule 54(b), and we now have jurisdiction to address the merits of the case.

2. The by-laws provided that, if any member received a bona-fide offer to purchase his share in the Club, he must send the Club a copy of the proposed sales agreement and notify the Club of his intent to accept it. The Club would then have thirty days to accept the terms of the agreement and purchase the share itself. If the Club declined to exercise its right of first refusal, it still retained the right to approve of the outside buyer.

staining) to finance each purchase by assessing a percentage of the price against the remaining shares. This resulted in Mullins being assessed $31,450.55 on his single share and Stinson (who owned two shares in addition to the one he was selling) being assessed $78,043.96. The Board sent assessment requests to all its members and notified Stinson and Tyson that it had voted to purchase their shares.

Not long thereafter, controversy arose on two fronts. First, Tyson emailed a board member stating, "This is not what I wanted to happen." Tyson explained that he desired to sell his share to Clay and continue hunting at the Club as Clay's guest. He also stated that he was unaware of certain Club rules and regulations, and he asked the Club to forward copies of its articles and bylaws to him. Despite Tyson's misgivings, the Club informed him that it had purchased his share and that he no longer had Club privileges. Secondly, Mullins and Stinson refused to pay the assessments against their shares, citing the Club's lack of authority to levy assessments for the purpose of repurchasing a member's stock. As the dissension over this point mounted, Mullins announced that his share would be put up for sale as well.

The Club responded to Mullins's and Stinson's failure to pay their assessments by suspending their membership privileges and scheduling a board meeting to consider their expulsion. In December 2004, the board met and terminated their memberships on two grounds: 1) failure to pay the assessments, and 2) providing false information about McQueen's $212,000 offer to Stinson. The latter ground was based on the board's belief that Mullins and Stinson misrepresented that Stinson had a firm deal to sell his share to McQueen. The Board also rescinded its $212,000 offer to purchase Stinson's share. President Hearnsberger appointed a committee to engage an appraiser for the purpose of establishing the value of Mullins's and Stinson's shares.

Meanwhile, Mullins, Stinson, and Tyson hired an attorney, who informed the board that all three men would sell their shares (five total) to the Club for $212,000 each. The Club apparently took this letter as proof that all three men were involved in a conspiracy to artificially increase the value of their stock, and the board scheduled a meeting to address Tyson's conduct with regard to the sales. In April 2005, the board voted to terminate Tyson's membership for "conduct unbecoming a member" and to rescind its offer to purchase Tyson's share.

At some point, the Club obtained an appraisal that valued its shares at $93,100 each—an amount less than the original 1993 subscription price and far less than the price the Club agreed to pay at the October 2004 meetings. The Club informed appellees that it would pay that price for their shares.

Mullins, Stinson, and Tyson did not accept the Club's offer to purchase their shares for $93,100. Instead, they sued the Club and its remaining members for wrongful expulsion, alleging the Club's lack of authority to impose the assessments and other "oppressive" conduct. Their complaint sought an order enjoining the Club's actions, declaring the Club's actions null and void, awarding monetary damages, and dissolving the Club and appointing a receiver. The Club answered that it had the power to levy the assessments and that all three appellees had engaged in conduct unbecoming a member, warranting their expulsion. Following discovery, each side filed a motion for summary judgment with numerous attachments, including minutes of relevant meetings; corporate articles, by-

laws, and other documents; and affidavits and depositions from almost all members and directors. After viewing the attachments and hearing the parties' arguments, the circuit court entered a partial summary judgment, ruling that the Club's assessments were improper; that the termination of appellees' memberships was improper; that the Club's actions were oppressive; and that the Club should be dissolved and a receiver appointed.

The Club now appeals from the summary-judgment order. It argues that, contrary to the court's ruling, it possessed the authority to burden Mullins's and Stinson's shares with assessments; that it had the power to expel Mullins and Stinson for not paying the assessments; that it had the power to expel all three appellees for conduct unbecoming a member, *i.e.*, conspiring to inflate the price of their shares; and that it did not engage in oppressive conduct that would require corporate dissolution under Ark.Code Ann. § 4–27–1430 (Repl.2001). As we will explain, issues of material fact remain on each of these issues, thereby precluding the entry of summary judgment.

■ With regard to the Club's authority to levy assessments, both sides asked the circuit court to glean the extent of the Club's assessment power by reviewing the language in its corporate documents. The court's task was akin to contract interpretation. *See* William Meade Fletcher, *Fletcher Cycolpedia of the Law of Private Corporations* §§ 3640 & 4198 (Revs.2006 and 2001). *See also Taylor v. Hinkle*, 360 Ark. 121, 200 S.W.3d 387 (2004). The law of contract interpretation is well established. The court's duty is to construe the meaning of the writing in accordance with the plain language employed. *Machen v. Machen*, 2011 Ark. App. 47, 380 S.W.3d 497. When a contract is free of ambiguity, its construction

and legal effect are questions of law for the court to determine. *Id.* But, if there is doubt or uncertainty as to the meaning of the writing and it is fairly susceptible to more than one equally reasonable interpretation, it is ambiguous. *Id.* The meaning of an ambiguous writing is a question of fact, and the fact-finder may use parol evidence to aid in interpreting the writing. *See First Nat'l Bank v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992).

■ Here, the parties presented the court with more than one equally reasonable interpretation of the Club's corporate documents. The Club cited provisions of its private offering memorandum, subscription agreement, and articles of incorporation, stating that stockholders' shares were "assessable" and that memberships could be terminated for failing to pay any assessments. Appellees cited provisions of those same documents, along with the Club's by-laws, purporting to limit the Club's assessment authority to certain specific purposes, none of which included the repurchase of a member's share. The private offering memorandum, for instance, declared that members' shares were subject to assessments for "additional capital"; or for "alteration, modification, or improvement of the Corporation's facilities"; or for "operating expenses and capital improvements." The subscription agreement and articles of incorporation allowed assessments "as set forth in the by-laws," which, in turn, provided that taxes and "capital assessments" would be subject to payment by all shareholders, and that any assessment recommended or requested for "alteration, modification, or improvement of Corporation facilities" must be approved by the shareholders at a special meeting.

The parties also offered, as attachments to their motions for summary judgment, extrinsic evidence as an aid to interpreting the documents. The Club

provided minutes from previous shareholder meetings in which assessments were imposed and presented affidavits from several shareholders who stated that the Club was not a money-making enterprise and that the only way to buy a member's share, pursuant to the Club's right of first refusal, would be by assessment. Appellees, for their part, claimed that the assessments mentioned in the Club's minutes were strictly for the purpose of improvements or repairs. They also noted that one set of minutes reflected the repurchase of a member's share via a bank loan rather than by a designated assessment. Based on these submissions, the court ruled that the Club lacked the authority to impose the assessments on Mullins's and Stinson's shares.

■■■■ Given the nature of the parties' arguments and proof, we cannot help but conclude that the circuit court weighed the parties' evidence, interpreted an ambiguous set of documents, and reached a factual finding as to their meaning.[3] A factual finding, however, is not within the realm of a summary judgment. *See Lee v. Mansour,* 104 Ark.App. 91, 289 S.W.3d 170 (2008). The purpose of a summary judgment is not to try the issues but to determine whether there are any issues to be tried. *Beckworth v. Diamante,* 2010 Ark. App. 814, 379 S.W.3d 752. Even where parties file cross-motions for summary judgment, the proceeding is not converted into a bench trial; rather, the circuit court's ruling must still be one of law. If material issues of fact remain to be decided, the circuit court may deny cross-motions for summary judgment. *Acuff v.*

*Bumgarner,* 2009 Ark. App. 854, 371 S.W.3d 709. We therefore hold, as we did in *Deltic Timber Corp. v. Newland,* 2010 Ark. App. 276, 374 S.W.3d 261, that where it is impossible to determine on appeal that either party is entitled to judgment as a matter of law, summary judgment should be reversed, even if the parties have filed cross-motions for summary judgment.

■■■■ Our holding applies equally with regard to the circuit court's rulings that appellees' expulsions were improper and that the Club's conduct was oppressive.[4] On each point—including whether appellees made misrepresentations amounting to conduct unbecoming a member—the facts, though in no serious dispute, support conflicting inferences. Such inferences should be viewed not through the lens of summary judgment but from the standpoint of a fact-finder following a bench trial or jury trial. Where facts are not disputed but reasonable inferences to be drawn therefrom are, summary judgment is inappropriate. *See Flentje v. First Nat'l Bank of Wynne,* 340 Ark. 563, 11 S.W.3d 531 (2000).

Reversed and remanded.

MARTIN and BROWN, JJ., agree.

---

3. Both sides, in their opening briefs to this court, cite the clearly erroneous standard of review, which is applicable when reviewing a circuit court's factual findings. Ark. R. Civ. P. 52(a) (2011).

4. The parties agree that the reasonableness of the Club's $93,100 per-share appraisal is a fact question.