2012 Ark. App. 107
**Creed SPANN, Gary Beckwith, and Spann & Associates, Limited, Appellants**

v.

**LOVETT & COMPANY, LIMITED, Appellee.**

**No. CA 11–511.**

Court of Appeals of Arkansas.

Feb. 1, 2012.

Joseph A. Strode, Pine Bluff, and Tanya Briana Spavins, Little Rock, for appellant.

Jim L. Julian, Little Rock, for appellee.

RAYMOND R. ABRAMSON, Judge.

This lawsuit arises from an accounting firm's agreement to purchase another firm's office in Pine Bluff, as well as subsequent disputes. After the purchaser sued the seller and recovered a substantial jury verdict for breach of contract, the trial court awarded prejudgment interest and attorney's fees. We affirm the judgment in all respects.

Appellant Creed Spann established an accounting firm, appellant Spann & Associates, Limited, in Pine Bluff, and it thrived. Around 2000, Spann & Associates opened an additional office in Hot Springs, which also did well. Appellant Gary Beckwith went to work with Spann & Associates and became a shareholder. Scott Lovett, who has practiced as an accountant for over forty years, established appellee Lovett & Company, Limited. On June 30, 2005, Spann & Associates sold its Pine Bluff office to appellee, as set forth in a written purchase agreement, for $850,000. The assets transferred included all tangible personal property located at the office; the telephone numbers and post-office box; and "all client lists, billing information, and records arising out of the business." Spann & Associates expressly assigned to Lovett all goodwill, client lists, and records with an attached client list and a list of excluded clients.

The parties agreed that appellee would deliver $700,000 in cash to Spann & Associates at closing and a promissory note in the amount of $150,000, due on October 15, 2006. Section 2.4 of the contract set forth the allocation of the consideration for purposes of state and federal tax reporting: $5,000 corresponded to the covenant not to compete; $733,500 was given for the client lists and files; and $111,500 was allocated to the furniture, fixtures, and equipment. Appellee assumed some maintenance and utility contracts.

The closing agreement provided in Section 2.3 that the price would be adjusted, and Spann & Associates would refund a portion of the purchase price to appellee, if the business did not generate $850,000 in fees the first year that appellee owned the business:[1]

> (c) If the Professional Fees are less than $700,000, then Seller shall refund to Buyer an amount equal to $700,000 less the Professional Fees. Any amount to be refunded by Seller to Buyer under this paragraph shall bear interest at the rate of 3% per annum which shall accrue from June 30, 2005 until paid. Interest shall be computed on the basis of a 365–day year. Seller shall make this refund payment plus interest to Buyer on or before October 15, 2006.

The contract defined "professional fees" as follows:

> 1.7. *Professional Fees.* The term Professional Fees shall mean all fees collected from the Clients during the period of July 1, 2005 through Septem-

---

[1]. The parties referred to this price-adjustment provision as the "true-up" provision.

ber 30, 2006 based on billings for services rendered by Buyer during the period of July 1, 2005 through June 30, 2006 without regard to where the work is performed or from where the bills are sent. All services rendered by Buyer through June 30, 2006 shall be billed to the Clients on or before July 10, 2006. The term Professional Fees does not include expenses such as travel, postage, and copying which are billed to the Clients.

The purchase agreement's covenant not to compete provided:

7.1. *Covenant Not to Compete.* In consideration for the payment of the Purchase Consideration, Seller, and its shareholders, Creed Spann and Gary Beckwith, individually, shall refrain, directly or indirectly, as employee, shareholder, director, officer or agent, from carrying on an accounting business in the geographical area covering a fifty mile radius from Pine Bluff, Arkansas, and for a period of five (5) years from the Closing Date.

7.2. *Excluded Clients of Seller.* Excluded from the covenant not to compete under this Article 7 are those specific clients listed in Exhibit D attached hereto.

Exhibit D, which listed the clients excluded from the covenant not to compete, began as follows:

The following represents those clients who may be included in the sale of the Pine Bluff office by virtue of the fact that these clients might be within the fifty mile radius of Pine Bluff, Arkansas, but they are not being serviced out of the Pine Bluff office of Spann and Associates and they have not been serviced by that office for some time.

The purchase agreement also provided that Creed Spann would, on a reasonable basis, render services to the clients be-

tween July 1, 2005, and July 30, 2008, for compensation and, for no compensation, answer questions and make introductions during the transition. The contract further provided that Michele Birge, one of Spann & Associates' employees, would be available to work at least fifty percent of the time for the Pine Bluff office; appellee agreed to reimburse Spann & Associates accordingly. Birge and two other employees of Spann & Associates, Tammy Corkins and Catherine Milum, also signed agreements not to compete with appellee, which Creed Spann agreed to guarantee. Birge's contract included the following provision:

1. Except as provided for in paragraph 2 below, Birge agrees that she shall refrain, directly or indirectly, as employee, shareholder, director, officer or agent, or in any other capacity from carrying on an accounting business which solicits any client which is an existing client of the office of Spann & Associates, Ltd.'s located in Pine Bluff, Arkansas, as of June 30, 2005, or from carrying on an accounting business in the geographical area covering a fifty mile radius from Pine Bluff, Arkansas, and for a period of five (5) years from June 30, 2005. Excluded from this agreement not to compete are those specific clients listed on Exhibit A attached hereto.

The other agreements contained similar language. After the sale, Corkins continued to work in the Pine Bluff office, and Spann & Associates purchased her interest in its business. Milum became an employee of appellee. Creed Spann, as president, signed the contract for Spann & Associates; he and Beckwith, "shareholders," also signed "individually."

Appellee did not receive $850,000 in fees during the first year. A number of clients whose files were intended to be conveyed

by the agreement decided to leave the Pine Bluff office; some of them went to Spann & Associates in Hot Springs. Appellee sued appellants in November 2007 for fraud and breach of contract, alleging that appellants had breached the covenant not to compete and requesting a reduction of the purchase price. Appellants raised a number of affirmative defenses, including first material breach in appellee's failure to timely bill clients; failure to give credit for receipts for services rendered by Spann on behalf of appellee; failure to bill for services rendered by Scott Lovett; waiver; and estoppel. Appellants also argued that the noncompetition clause was invalid and unenforceable. They filed a counterclaim for a full accounting and the balance due from appellee.

In an amended complaint, appellee alleged that it had collected only $487,578 for work performed during the first year. It alleged that Spann & Associates had rendered accounting services to persons and businesses on the protected client list and clients that resided in the geographical area (other than the clients on the excluded client list). Appellee sought damages for breach of the "true-up" provision and the noncompetition clause, plus attorney's fees. It also alleged fraud and tortious interference. Appellants brought a counterclaim for an accounting, wrongful termination of Creed Spann's employment agreement, declaratory judgment regarding the covenant not to compete, and fraud.

Appellee moved for partial summary judgment on its breach-of-contract claims. Appellants moved for partial summary judgment on appellee's claims for breach of the noncompetition agreement, fraud, and tortious interference. They also asked the court to declare the noncompetition agreement unenforceable and void. In a second motion for partial summary judgment, Lovett sought judgment on appellants' counterclaim and first-material-breach defense. Lovett filed a motion in limine to prohibit the introduction of evidence regarding the meaning of the noncompetition agreement.

On July 6, 2009, the circuit court granted Lovett summary judgment on the issue of the breach of the covenant not to compete and denied appellants' motion on that issue.[2] The court also granted appellee summary judgment on the meaning of that section of the contract concerning Creed Spann's services; appellants' first-breach defense; and appellants' counterclaim for wrongful termination. It granted summary judgment to Lovett on appellants' counterclaim for, and defense of, fraud. It granted summary judgment to appellants on Lovett's claims of fraud and tortious interference. The court denied Lovett's motion for summary judgment on the issue of the breach of the price-adjustment provision, stating that whether any shortfalls under that provision were caused by Lovett's fault was an issue of fact for the jury. It also denied Lovett's motion for summary judgment on the issue of appellant's first-breach defense, stating that the issues of whether Lovett first breached the contract, and whether that breach was material, were fact questions for the jury.

At trial, appellee presented the testimony of Scott Lovett, Tammy Corkins, James McClellan, Kevin White, Gary Beckwith,

---

2. Ordinarily, summary judgment may be granted by a trial court only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, clearly show that there are no genuine issues of material fact to be litigated and the party is entitled to judgment as a matter of law. *Bisbee v. Decatur State Bank,* 2010 Ark. App. 459, 376 S.W.3d 505.

and Steve Schroeder. McClellan, a civil engineer, measured the distances between the Pine Bluff office and certain clients. A map plotting these points was admitted into evidence. White, a CPA, testified about his calculations of damages for appellants' breach of the price-adjustment clause. This exhibit provided:

| | |
|---|---|
| Initial Payment | $700,000.00 |
| Payments Received From 8/1/05–6/30/06 For Professional Services of Contract Period | $413,479.37 |
| Payments Received From 7/1/06–9/30/06 For Professional Services of Contract Period | $ 45,606.35 |
| Subsequent Billings for Contract Period that were collected within 92 day period | $ 33,734.66 |
| Amount due Lovett | $207,179.62 |

White admitted that Lovett did not bill for all of its services by July 10, 2006, and that his calculations did not include any amount that had been received after ninety-two days or that had been written down or off.

Tammy Corkins testified about billings and receipts, write-offs and write-downs, amounts due Creed Spann, her unsuccessful efforts to arrive at a calculation of the price-adjustment amount with Beckwith, and damages resulting from the breach of the covenant not to compete ($440,300.50). She stated that Creed Spann told her, "[I]f those clients are going to leave anyway, then he was going to get them back even if he had to pay Scott for them."

Steve Schroeder, a forensic economist and business appraiser, testified regarding his calculation of damages for breach of the covenant not to compete. He explained that $434,777 was the amount that Lovett would have realized in the form of profits if appellants had not done business, and Lovett had done business, with those customers.

At the conclusion of appellee's case, appellants moved for directed verdict that Lovett had breached Section 1.7 of the agreement (leaving damages for the jury); that the covenant not to compete was invalid; that there was no evidence that appellants caused Lovett any damages by breaching the covenant not to compete; that the evidence of lost profits was inadequate; and on appellants' defense of waiver. The court granted a directed verdict that Lovett did not bill all of the clients by July 10, 2006, and left it to the jury to decide if that was a first material breach. The court denied the motion on the other grounds.

Appellants presented the testimony of Bruce Mitchell, a client of Spann & Associates that left Lovett in 2008 and went to another firm in Pine Bluff; Jay Bradford, a long-time friend and client of Creed Spann, who took his father's file to Spann's Hot Springs office in 2006; and William Strong, who took his companies' business to another firm after the sale but took his family's limited partnership's trust and estate-planning business to Spann. Strong testified that he had confidence in no one

at appellee's office but admitted that he did not know if he would have left this business with Lovett if he had not moved it to Spann. He could not recall having been told by Creed Spann that he could not do the work because of the noncompetition clause. Betty Strong testified that it was "highly likely" that she would not have kept her business with Lovett if her father had not taken the Strong family accounts back to Spann. She said that Creed Spann did not solicit her business. Scott Mosley (another client of Spann's who did not use Lovett's services) also testified. Gaines Williamson, who moved his personal accounting work from Lovett to Spann, testified that he had been a client of Spann for thirty years and was not satisfied with Lovett's services. He said that he had lived next door to Creed Spann, watched his children grow up, and considered him a friend. Dr. Scott Winston, a long-time client of Spann, testified that he transferred his business from Lovett to Spann because he was not pleased with Lovett's services. He stated, "It really didn't make any difference what Scott Lovett did or didn't do to try to get my business, I wanted to stay with Creed Spann." Dr. John Busby also testified that he decided not to stay with Lovett because he was dissatisfied with the person who replaced Michele Birge (Corkins) in 2006. He explained: "If I had not made the move to Spann & Associates I would not have kept using Lovett & Company." He said that Creed Spann had not solicited his business.

Gary Beckwith testified at length about the events following the sale, the recovery of certain client files, and the flaws in Lovett's calculations of damages. He stated that Lovett failed to bill $155,359.76 for services by July 10, 2006. He also said that there were other problems in Lovett's calculations, such as not crediting certain receipts for services billed after July 10, 2006, and received after ninety-two days.

Stephanie Henderson, an employee of Spann's Pine Bluff office, testified that when she left a few months after the sale and went to work in-house for Briggs Brothers Farms, those accounts left Lovett. Michele Birge described the conditions at the Pine Bluff office after the sale as very chaotic and confusing and said that the clients did not receive the same level of service from Lovett as they had from Creed Spann. She said that clients left for other accounting firms, some of them to Spann's Hot Springs office, because of the quality of service.

Creed Spann also testified about the events leading up to and following the sale; the development of his business; his work for Lovett after the sale; and his concerns about the clients. He stated that Scott Lovett brought certain files of clients leaving Lovett's firm to the Hot Springs office on July 23, 2006. Appellants proffered his testimony about his construction of the covenant not to compete, as well as that of George Cumpata (a CPA in Illinois), and William Marshall (a CPA and attorney in Little Rock).

At the end of the trial, appellants moved for directed verdict on the interpretation of the covenant not to compete, damages regarding that covenant, and waiver and estoppel as to the "repurchased clients" whose files Lovett delivered to Spann in July 2006. Appellants admitted that fact questions remained for the jury as to whether the failure to bill by July 10, 2006, was a first material breach. Appellee moved for directed verdict on the ground that the covenant was a joint and several obligation and that it did not commit a first material breach. The court denied appellants' motion on all bases. It denied appellee's motion on all grounds except waiver but allowed appellants' defense of

accord and satisfaction to go to the jury. It also ruled that liability would be joint, not separate, as to the covenant.

The jury returned a verdict in favor of Lovett for $434,477 on its claim for breach of the covenant not to compete. It also returned a verdict for $165,566.91 for Lovett on its claim under the price-adjustment provision. The court found that Lovett, having prevailed in this breach-of-contract action, was entitled to a reasonable attorney's fee under Arkansas Code Annotated section 16–22–308 in the amount of $252,182.25. The court awarded Lovett prejudgment interest of $27,216.48 on the $165,566.91 verdict. The judgment entered jointly and severally against all appellants for breach of the covenant not to compete was $686,659.25 ($434,777 plus $252,185.25). The judgment entered against Spann & Associates for the price-adjustment verdict and prejudgment interest was $192,783.39. Appellants filed a timely notice of appeal.

## I. *Covenant Not to Compete*

In their first point, appellants argue that the trial court erred in ruling that the covenant unambiguously prohibited them from serving clients within the fifty-mile radius of Pine Bluff (in addition to opening an office there). They assert that the covenant should be construed in conjunction with the covenants signed by Corkins, Birge, and Milum, which contained provisions that they would refrain from carrying on an accounting business that "solicits any client which is an existing client of the office of Spann & Associates, Ltd.'s located in Pine Bluff, Arkansas . . . ," in addition to a geographical limitation like the one in the purchase agreement.[3] This

difference, they argue, demonstrates the parties' intent to tie the noncompetition clause only to the location of the office.

The determination of whether ambiguity exists is ordinarily a question of law for courts to resolve. *Machen v. Machen*, 2011 Ark. App. 47, 380 S.W.3d 497. When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine, and it is the court's duty to construe the writing in accordance with the plain meaning of the language employed. *Id.* Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation. *Id.* The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. *Id.* We must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. *Id.* It is a well-settled rule that the intention of the parties to a contract is to be gathered, not from particular words and phrases, but from the whole context of the agreement. *Id.* In determining the true intentions of the parties, different clauses of a contract must be read together and construed so that all of its parts harmonize if that is possible. *Harris v. Harris*, 82 Ark.App. 321, 107 S.W.3d 897 (2003). Where the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the trial court's duty to make such a determination as a matter of law. *Smith v. Farm Bureau Mut. Ins. Co. of Ark., Inc.*, 88 Ark.App. 22, 194 S.W.3d 212 (2004).

Here, the trial court correctly viewed the purchase agreement as unambiguous

---

3. When a written contract refers to another instrument and makes the terms of that instrument a part of the contract, the two are construed together as the agreement of the parties. *Isbell v. Ed Ball Constr. Co.*, 310 Ark. 81, 833 S.W.2d 370 (1992); *see also Integon Life Ins. Co. v. Vandegrift*, 11 Ark.App. 270, 669 S.W.2d 492 (1984).

and as prohibiting appellants from serving clients located within the fifty-mile radius of Pine Bluff. Although appellants' construction of the contract is not unreasonable, it is not "equally reasonable," *Machen*, 2011 Ark. App. 47, at 13, 380 S.W.3d at 505, as the court's interpretation. Most persuasive is the contract's specific exception of the files of certain clients that were not conveyed and the provision addressing the clients that were conveyed (quoted above); unless they were expressly excluded, appellants could not do business with clients within the fifty-mile radius of Pine Bluff. The court's interpretation is also supported by *Hudgens v. Olmstead Manufacturing Company*, 227 Ark. 475, 476, 300 S.W.2d 26, 28 (1957), where the appellant had agreed not to engage "in any business competitive with that to be conducted by the Buyer...." The supreme court concluded: "It is immaterial that Hudgens carried on his operations in the prohibited area from a headquarters outside that area, as there is still a violation of the contract. Corbin on Contracts, § 1386...." *Id.* at 477, 300 S.W.2d at 28.

Appellants further contend that the trial court should have considered the evidence they proffered in support of their assertion that, within the accounting business, such provisions in covenants are commonly understood as referring to the location of the accountant, not the clients served. Alternatively, appellants argue that, if we do not construe the covenant as merely prohibiting them from opening an office within fifty miles of Pine Bluff, the agreement was ambiguous and the issue of what the parties intended should have gone to the jury. If the contract is ambiguous, the parties' intent becomes a question of fact, *NCCF Support, Inc. v. Harris McHaney Real Estate Co.*, 2010 Ark. App. 384, 376 S.W.3d 459, and parol evidence is admissible. *Integon Life Ins. Co., supra.* We disagree with both contentions. Because the covenant was unambiguous, parol evidence was not admissible and the issue was for the court to decide.

Appellants conclude their argument under this point by asserting that the covenant, as construed by the trial court, is unreasonable, over broad, and void because Lovett has no legitimate interest in prohibiting "one more small accounting firm" in an area that includes Little Rock, Malvern, Benton, Fordyce, Pine Bluff, and Bryant. A reasonably drawn covenant not to compete is an effective means by which a principal may protect its customers and its confidential information from appropriation and use by former agents and competitors. *Statco Wireless, LLC v. Southwestern Bell Wireless, LLC,* 80 Ark.App. 284, 95 S.W.3d 13 (2003). Covenants not to compete are not looked upon with favor by the law. *Mercy Health Sys. of Nw. Ark., Inc. v. Bicak,* 2011 Ark. App. 341, 383 S.W.3d 869. In order for such a covenant to be enforceable, three requirements must be met: (1) the covenantee must have a valid interest to protect; (2) the geographical restrictions must not be overly broad; and (3) a reasonable time limit must be imposed. *Id.* The test of reasonableness of contracts in restraint of trade is that the restraint imposed upon one party must not be greater than is reasonably necessary for the protection of the other, and not so great as to injure a public interest. *Id.* Unless the covenantee has a legitimate interest to be protected by the agreement, the law will not enforce such a contract, as this would merely prohibit ordinary competition. *Id.* Contracts in partial restraint of trade, where ancillary to the sale of a business or profession with its goodwill, are valid to the extent reasonably necessary for the purchaser's protection, and are looked upon with greater favor than agreements ancillary to employer-employ-

ee or professional-association relationships. *Id.* The validity of such a covenant depends upon the facts and circumstances of each particular case. *Id.*

We affirm the trial court's ruling on this issue. This transaction concerned the sale of a business. Lovett had a legitimate interest in restraining appellants, who continued their business in Hot Springs, from doing business in that area. There was no dispute that the biggest asset that Spann & Associates had to convey to Lovett was the opportunity to do business with the clients. The parties have been in the accounting business for decades and negotiated this agreement as an arm's-length deal. Obviously, they recognized the value of the business's goodwill and long-established client base. Although they assigned only a $5,000 value to the covenant itself for tax purposes, they expressly allocated $733,500 to the sale of the client files.

## II. *Damages*

In their next point, appellants argue that the trial court erred in ruling that they were jointly liable for damages under the covenant. They point out that Spann and Beckwith individually agreed to refrain from carrying on an accounting business in section 7.1 of the contract. Whether the liability of the promisors is joint depends upon the intention of the parties, ascertained from the contract by the ordinary rules of construction; in the absence of statute, the liability of two or more promisors upon the same contract is a joint liability, if the rest of the contract does not show that a different liability was intended. *Bledsoe v. Carpenter*, 160 Ark. 349, 254 S.W. 677 (1923). All of the joint promisors are liable upon a joint contract, no matter who commits the breach. *Id.; see also* Restatement (Second) of Contracts § 289 (1981). The covenant did not

indicate that Spann's and Beckwith's liabilities were separate or that each would not be liable for the other's breach. Because Spann and Beckwith were both shareholders, one could reasonably infer that their signing the contract "individually" simply made it clear that they were binding themselves, as individuals, as opposed to the company. Therefore, it is reasonable to construe their liability for the noncompetition covenant as joint.[4] We affirm on this point.

## III. *Motion for Directed Verdict*

Appellants next argue that the trial court erred in denying their motion for directed verdict on the noncompetition damages on the ground that there was insufficient evidence that, even if they "technical[ly] breached the contract, they caused any client to leave Lovett"; instead, they "merely picked up the pieces as they fell." Appellants note the testimony of the clients who left Lovett and went to Spann to support their argument that the clients would have left Lovett regardless of Spann's actions. A directed-verdict motion is a challenge to the sufficiency of the evidence, and when reviewing the denial of a motion for a directed verdict, we determine whether the jury's verdict is supported by substantial evidence. *Phillippy v. ANB Fin. Servs., LLC,* 2011 Ark. App. 639, 386 S.W.3d 553. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Id.* When determining the sufficiency of the evidence, the appellate court reviews the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was

---

4. They were not jointly liable for the purchase price.

entered. *Id.* We do not try issues of fact but examine the record to determine whether there is substantial evidence to support the jury's verdict. *Boellner v. Clinical Study Ctrs., LLC,* 2011 Ark. 83, 378 S.W.3d 745. Thus, when testing the sufficiency of the evidence on appellate review, we need only consider the testimony of appellees and evidence that is most favorable to appellees. *Id.* We defer to the jury's resolution of the issue unless we can say that there is no reasonable probability to support the appellee's version. *Id.*

It is true that, to be recoverable, damages must have been, in a legal sense, caused by the wrongful act; typically, more certainty is required for a contract claim than for a tort claim. Howard W. Brill, *Arkansas Law of Damages* § 4.5 (5th ed.2004). In general, damages recoverable for breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached. *Dawson v. Temps Plus, Inc.,* 337 Ark. 247, 987 S.W.2d 722 (1999). Damages must arise from the wrongful acts of the breaching party. *Id.* Consequential damages are such damages, loss, or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act. *Id.* Lost profits are recognized as a type of consequential damages. *Id.* In breach-of-contract[17] cases, consequential damages are recoverable when they were fairly within the contemplation of the parties. *Id.* While lost profits will not be allowed as damages if the trier of fact is required to speculate as to the fact or amount of profits, less certainty is required to prove the amount of lost profits than is required to show that profits were lost. *Tremco, Inc. v. Valley Aluminum Prods. Corp.,* 38 Ark.App. 143, 831 S.W.2d 156 (1992). If it is reasonably certain that profits would have resulted had the contract been carried out, then the complaining party is entitled to recover. *Id.* Loss may be determined in any manner that is reasonable under the circumstances. *Id.; see also Hudson v. Cook,* 82 Ark.App. 246, 105 S.W.3d 821 (2003). The fact that a party can state the amount of damages he suffered only approximately is not a sufficient reason for disallowing damages if, from the approximate estimates, a satisfactory conclusion can be reached. *Jim Halsey Co. v. Bonar,* 284 Ark. 461, 683 S.W.2d 898 (1985). It has also been held that damages may be approximated; that a damage figure will be upheld if an amount approximating that figure can be ascertained from the evidence; and that a damage award need not correspond in amount to the proof adduced by either party. *Phillippy, supra.* When, from the nature of the case, the amount of damages cannot be estimated with certainty, or only a part of them can be estimated, the question should go to the jury. *Id.*

Appellee presented enough evidence of causation to get to the jury. Through the testimony of Schroeder and Corkins, Lovett established that it would have realized $434,777 in profits from the clients who went back to Spann, if they had not left Lovett. Although appellants' witnesses countered this evidence, the jury believed that appellants' breach did [18]cause Lovett damages. The jury was not required to believe appellants' witnesses, who admittedly had long-term, friendly relationships with Creed Spann. Appellants have cited, and we have found, no case holding that Lovett was required to produce clients to testify that they would not have left Lovett if they could not go back to appellants.

### IV. *Waiver and Estoppel*

Appellants next argue that the trial court erred in refusing to instruct the

jury on waiver and estoppel regarding (1) Michele Birge's resumption of her services as office manager for Dr. Busby's clinic in Pine Bluff as an exclusive employee of Spann & Associates, and (2) Spann & Associates' agreement to repurchase some client files from Lovett. While Birge was a joint agent for appellee and Spann & Associates during the first year of the contract, she served as office manager for Dr. Busby, on behalf of appellee. She then began working full-time for Spann & Associates, and appellee assigned Tammy Corkins to replace her at the clinic. Dr. Busby was not pleased with the new arrangement, and Birge went back to work for him as an employee of Spann & Associates. According to appellants, appellee agreed to or condoned Birge's resumption of those duties on behalf of Spann & Associates and, having waived its right to damages arising from Birge's work for Dr. Busby by not suing Birge, is now estopped to claim such damages. Appellants, however, offer no support for this assertion. It has long been held that we will not address arguments unless they are sufficiently developed and include citation to authority. *Hatch v. Hatch*, 2009 Ark. App. 337, 308 S.W.3d 174.

Appellants also assert that, when Scott Lovett delivered to Spann & Associates the files of certain clients who did not want to work with appellee, and the parties agreed that Spann & Associates would pay appellee the amount of its first year's billings for these clients, appellee waived this breach. We disagree. A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *Ludwig v. Bella Casa*, 2010 Ark. 435, 372 S.W.3d 792. We will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.* Waiver is

the intentional relinquishment of a known right, done with the intent to forever be deprived of its benefits. *Conway Commercial Warehousing, LLC v. FedEx Freight East, Inc.*, 2011 Ark. App. 51, 381 S.W.3d 94. It may occur where a person takes action that is inconsistent with the right or his intention to rely on it. *Id.* Waiver is ordinarily a question of fact. *Id.* The essential elements of equitable estoppel are (1) the party to be estopped must know the facts; (2) the party must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe the other party so intended; (3) the party asserting estoppel must be ignorant of the facts; and (4) the party asserting estoppel must rely on the other party's conduct to his detriment. *Larco, Inc. v. Strebeck*, 2010 Ark. App. 263, 379 S.W.3d 16.

We agree with appellee that in this case, the principles of waiver and estoppel are inseparable. *See S.H.V.C., Inc. v. Roy*, 188 Conn. 503, 450 A.2d 351, 354 (1982), where the Supreme Court of Connecticut stated: "This court has determined that implied waivers and estoppels by conduct are so similar that they are nearly indistinguishable." In any event, a directed verdict as to estoppel was definitely appropriate because there was no evidence that appellants relied on this agreement. We also hold that there was no basis in the evidence for giving a waiver instruction. In July 2006, Scott Lovett delivered some files to appellants, and the parties agreed that Lovett would receive the amount of the first year's billings; that agreement, however, was never completed. The parties began a lengthy back-and-forth process of debating how much appellants owed Lovett under both sections of the contract and how much Lovett owed Creed Spann for his post-sale work. There was no evidence that Lovett intentionally relin-

quished all rights, forever, to this compensation.

## V. *Material Breach*

■ Appellants further contend that the trial court erred in not directing a verdict on the ground that appellee materially breached Section 1.7 of the closing agreement. The trial court granted a directed verdict that the late billings were a breach of contract and sent the issue of whether that breach was a first material breach to the jury. The court also let the jury decide whether the writing off or down of bills [5] was a breach and whether the late billings after July 10, 2006, was a first material breach. Scott Lovett admitted that appellee did not bill all of its services by July 10, 2006, and that appellee wrote off approximately $155,000 the first year. Appellants also stress that appellee's demand for $207,179.62 in damages under the price-adjustment clause included the bills that were sent after July 10, 2006, and did not give credit for the $155,359.76 in fees that were never billed. They contend that the jury's award of $165,566.91 is not supported by substantial evidence and ask us to either reverse and remand with instructions that the trial court reduce the award to $10,207.15 or remand for a new trial.

■ When performance of a duty under a contract is contemplated, any nonperformance of that duty is a breach. *Taylor v. George*, 92 Ark.App. 264, 212 S.W.3d 17 (2005). Usually, whether a breach of contract occurred is a question of fact. *NCCF Support, supra.* A "first breach" by one contracting party may release the other party from its contractual duties if the first breach is material and sufficiently serious. *Conway Commercial Warehousing, supra.* A material breach is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party. *Roberts Contracting Co. v. Valentine–Wooten Rd. Pub. Facility Bd.*, 2009 Ark. App. 437, 320 S.W.3d 1. However, a relatively minor failure of performance on the part of one party does not justify the other in seeking to escape any responsibility under the terms of the contract. *Boellner, supra.* An influential circumstance in determining whether a breach is material is the extent to which the injured party will obtain the substantial benefit that he reasonably anticipated. *Id.* If one party's breach is relatively minor, the other party's remedy is damages for the partial breach. *TXO Prod. Corp. v. Page Farms, Inc.*, 287 Ark. 304, 698 S.W.2d 791 (1985). First, appellants waived this argument at the conclusion of trial when their attorney said, "I really don't see the basis for a directed verdict on the true-up." In any event, the trial court did not err in sending this issue to the jury. The parties agreed that the contract was ambiguous as to write-downs and write-offs and submitted extensive testimony about how accounting firms routinely write down bills, depending on a number of factors.

## VI. *Prejudgment Interest*

■ Appellants' next argument concerns the award of prejudgment interest. The trial court awarded appellee $27,216.48 in prejudgment interest, under the price-adjustment clause, on the jury's award of $165,566.19. Prejudgment interest is compensation for recoverable damages wrongfully withheld from the time of loss until judgment. *Conway Commercial Warehousing, supra.* It is allowable where the amount of damage is definitely

---

**5.** Scott Lovett defined the term "write down" as an adjustment before sending a bill and a "write off" as one that is done after the invoice is sent.

ascertainable by mathematical computation or if the evidence furnishes data that makes it possible to compute the amount of damages without reliance on opinion or discretion. *Id.* If a method exists for fixing an exact value on the cause of action at the time of the occurrence of the event that gives rise to the cause of action, prejudgment interest should be allowed, because one who has the use of another's money should be justly required to pay interest from the time it lawfully should have been paid. *Southern Farm Bureau Cas. Ins. Co. v. Watkins,* 2011 Ark. App. 388, 386 S.W.3d 6. However, where conflict exists over the validity of the damages sought by the plaintiff and the fact-finder is required to use its discretion to determine the amount of damages, prejudgment interest should not be awarded. *Conway Commercial Warehousing, supra.*

Appellants argue that this award was error as a matter of law because appellee continued to make downward adjustments to the amount it claimed in damages, finally presenting $207,179.62 to the jury. We disagree. Although appellee continued to adjust its claim as appellants pointed out what they believed to be errors or omissions in the calculations, the contract provided an exact method to be followed in making those calculations. The price-adjustment clause provided for a refund to be made on October 15, 2006, of an amount equal to $700,000, less the professional fees, which the contract clearly ⌊23⌋defined. Whether the parties later disagreed about the amount of the professional fees was beside the point.

Appellants also assert that the trial court erred in awarding additional prejudgment interest because "the 3% prejudgment interest provision of the price adjustment clause was in front of the jury for its consideration." Again, we disagree. An award of prejudgment interest is a

question of law, to be decided by the court. David Newbern & John J. Watkins, *Arkansas Civil Practice & Procedure* § 31:10 (4th ed.2006); Howard W. Brill, *Arkansas Law of Damages* § 10:6 (5th ed.2004). There is nothing in the record to indicate that appellee claimed contractual prejudgment interest as an element of damages to be decided by the jury. *See* Brill, *supra* § 10:7, at 151. It was, therefore, proper for this issue to be decided by the trial court. We affirm on this point.

## VII. *Attorney's Fees*

■■■ In their last point, appellants argue that the amount of attorney's fees awarded by the trial court, $252,182.25, was excessive because (1) the itemized billing statements accompanying attorney Jim Julian's affidavit reflected bills for non-attorney support staff; (2) although the hourly rate was reasonable, the number of hours billed was excessive; and (3) appellee is not a prevailing party. Appellants ask us to reverse the award, along with the judgment on the contract issues, or at least remand for a hearing on the issue of attorney's fees. Appellants' first contention is without merit. Both the supreme court and this court have approved the inclusion of support staff's work in attorney's-fee awards. *See Jones v. Jones,* 327 Ark. 195, 938 S.W.2d 228 (1997); *Millwood–RAB Mktg., Inc. v. Blackburn,* 95 Ark.App. 253, ⌊24⌋236 S.W.3d 551 (2006). Appellants' remaining arguments are also without merit.

■■■ Arkansas allows a prevailing party in a breach-of-contract case to recover reasonable attorney's fees. Ark.Code Ann. § 16–22–308 (Repl.1999). A trial court is not required to award attorney's fees under this statute, however, and any amounts awarded are discretionary. *Worley v. City of Jonesboro,* 2011 Ark. App. 594, 385 S.W.3d 908. Although there is no

fixed formula in determining what constitutes a reasonable attorney's fee, a trial court should be guided by certain factors in considering a fee request, including the experience and ability of counsel; the time and labor required to perform the legal services properly; the amount involved in the case and the results obtained; the fees customarily charged; whether the fee is fixed or contingent; the time limitations imposed upon the client in the circumstances; and the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. *Id.* Due to the trial court's intimate acquaintance with the record and the quality of service rendered, we typically recognize the superior perspective of the trial court in assessing the applicable factors. *Id.; see also Conway Commercial Warehousing, supra.*

Clearly, appellee is the prevailing party. It is true that, while the trial court dismissed appellee's claims for fraud, reimbursement of the purchase money for the building, and tortious interference, and ruled on directed verdict that appellee had breached Section 1.7 of the agreement, it awarded appellee all of its requested fees. Appellants assert that the trial court should at least have deducted the fees relating to the "losing causes." Under Arkansas law, the prevailing party for purposes of awarding attorney's fees under section 16–22–308 is determined by looking at the case as a whole and analyzing each cause of action and its subsequent outcome. *Brackelsberg v. Heflin,* 2011 Ark. App. 678, 386 S.W.3d 636. The fact that a party does not recover all the damages it sought is not determinative of whether that party prevailed at trial. *Id.* Even though each side may win on some of the issues, the party "who comes out on top" and in whose favor the verdict compels a judgment is the prevailing party.

*Larco,* 2010 Ark. App. 263, at 8, 379 S.W.3d at 22. Clearly, the verdict compelled a substantial judgment for appellee.

The trial court believed that the hours appellee's attorneys worked on this case were "more than reasonable," and we agree. This case was filed in 2007 and was tried in December 2010. The record contains seventeen volumes. The parties filed numerous motions, briefs, responses, and replies, along with supporting documentation, and they engaged in extensive discovery. On some issues, multiple motions were filed. One cannot say that the preparation devoted to the dismissed causes of action was not relevant to the claims that went to trial. In the final judgment, the circuit court recognized the complexity of the issues, the experience and standing of Lovett's counsel, the amount in controversy, and appellants' "repeated attempts to re-litigate issues in this case, and delays which were not caused by [Lovett]." Lovett's motion for fees was supported by the affidavit of attorney Jim Julian; copies of complete billing records; and the affidavits of attorneys Philip Kaplan and William Allen. Appellants point out that one of Lovett's attorneys reported having worked over twenty-five hours on December 8, 2010. Although the billing records were obviously imperfect, the overall effect of this error was *de minimis* in relation to the many hours Lovett's attorneys devoted to this complex and lengthy proceeding. On the record as a whole, we cannot say that the trial court abused its discretion in awarding attorney's fees or in setting the amount.

Affirmed.

VAUGHT, C.J., and HOOFMAN, J., agree.