LARRY VAUGHT, Judge
The appellee, Chris Colbey d/b/a TimberPro Land Clearing (Colbey), sued the appellant, Reynolds Forestry Consulting and Real Estate, PLLC (Reynolds), for breach of contract, alleging that Reynolds failed to pay for site-preparation services that Colbey had performed on several tracts of forest land. After a bench trial, the circuit court found Reynolds in breach of contract and awarded Colbey damages and attorney's fees.
Reynolds now appeals the circuit court's judgment, alleging that reversal is warranted because Colbey was the first to materially breach the contract. Reynolds also asserts that the circuit court abused its discretion when it awarded attorney's fees to Colbey. We find no error and affirm.
I. Factual Background
On July 8, 2014, Colbey and Ted Reynolds, the owner of Reynolds Forestry Services, *179 executed a "Mechanical Site Preparation 2014 Contract" in which Colbey, in exchange for monetary payment, agreed to clear and prepare several tracts of land for reforestation beginning "no later than July 15, 2014," and finishing "no later than December 31, 2014." The contract required Colbey to "work on scheduled tracts continuously until complete," but allowed him to move his equipment "when tracts cannot be site prepared due to rains." The contract also required Colbey to "take all reasonable precautions against destructive practices," including using his heavy equipment on the land "during excessively wet weather," and it gave him the discretion to determine when the conditions were not suitable.[1] Reynolds likewise had the ability to suspend operations that were underway if, inter alia , "ground conditions [were] such that continued operations would cause excessive damage." Finally, either Reynolds or Colbey could terminate the contract, with proper notice, "when either party does not adhere to all aspects of this contract."
Several of the tracts of land were wet, to some degree, when Colbey began work on the contract in July 2014. Nonetheless, Colbey was able to finish preparing several of the tracts from late July to mid-August 2014. Most notably, he finished 172 acres on a tract of land called the Nevada 440 on July 28, 2014. Colbey stated that the Nevada 440 tract was wet, but he and his crew "were able to work around it and get a majority of it done." Reynolds expressed his satisfaction with Colbey's work on the Nevada 440 tract, and Colbey billed Reynolds $ 44,716 for the job.[2]
Following the completion of the Nevada 440 tract, Colbey and Reynolds discussed when the remaining lowland tracts would be dry enough for Colbey to begin work on them. Reynolds told Colbey that two tracts, the Nevada 120 and the Nevada 409/411,[3] had been sprayed with herbicide and, consequently, would not be ready for site preparation until August 29, 2014.[4]
Colbey subsequently moved on to another tract, the Nevada 115, and finished work on August 9, 2014. He billed Reynolds for $ 25,549. Colbey next finished a tract in Magnolia, the Chambers/Prince 80 tract, on August 13, 2014, and he billed Reynolds $ 11,455. Colbey then performed two types of services on two tracts in Union County, the Simmons 36 and the Simmons 98. He first performed a "site prep burn," in which he created a fire lane around the perimeter of the tracts and burned debris. He billed Reynolds $ 3,093 for that service. Colbey then sheared tree stumps and otherwise prepared the Simmons tracts for replanting. He finished on August 21, 2014, and sent an invoice to Reynolds for $ 16,410.
*180 Colbey and Reynolds revisited the topic of the Nevada 120 and the Nevada 411 tracts on or about August 21, 2014, when they began exchanging conflicting opinions about whether those tracts were ready for Colbey to begin preparing them for replanting. Colbey determined that the land was still too wet to support his equipment and, based on his previous discussion with Reynolds, did not expect those tracts to be ready until August 29, 2014.
Consequently, in the interim, Colbey moved his equipment to another tract nearby-the Potlach tract-to perform work on a different contract. That did not sit well with Reynolds, who insisted that its tracts were dry enough for Colbey to begin preparing them. Reynolds threatened to withhold the $ 44,716 payment for Colbey's work on the Nevada 440 tract to "partially offset anticipated loss in chemical and cuttings due to [Colbey's] damaging actions."
The disagreement intensified when Colbey finished the work on the Potlach tract and moved his equipment to the Nevada 120 and the Nevada 411 tracts on August 29, 2014. Colbey apparently did not move forward at all on the Nevada 120 tract because it was "saturated," and his equipment "immediately" got stuck. Colbey started work on the Nevada 411 tract on August 29, but wet conditions there caused similar problems with his equipment.
Colbey apparently told Reynolds that the Nevada 120 and the Nevada 411 tracts were still too wet for site preparation because, on August 30, 2014, Ted Reynolds sent an email reiterating Reynolds's opinion that the tracts were dry enough to prepare for replanting. Reynolds also declared the following:
Chances this year of completing previously dry 300+ acres on 411 followed by 120 are increasingly limited due to contract violation, and payment on 440 is regrettably held to compensate potential resulting reforestation expense loss, hopefully there will be none.
Colbey thereafter continued working on the Nevada 411 tract, preparing sixty-five acres of it for reforestation. His equipment got stuck several times, however, and he ceased operations on September 7, 2014. Colbey billed Reynolds $ 22,450 for the work he did on the Nevada 411 tract.
Colbey and Reynolds continued to disagree over the condition of the Nevada 120 and the Nevada 411 tracts, and Reynolds's continued threats to withhold payment led Colbey to exercise his right to terminate the contract. Specifically, at trial, Colbey testified as follows about the events that ensued after he ceased operations on the Nevada 411 tract:
Q. After completing [the] sixty-five acres on the 411 or 409 tract, did you express your opinion pretty strongly to Mr. Reynolds about the condition of the tract being unworkable?
A. Yes sir.
Q. What did you tell him?
A. I just told him the tract was too wet to work.
Q. And what was his response about continuing threats to not pay?
A. He said that he wasn't going to pay me for the work that we had completed on other tracts. He was withholding that money unless we completed this tract.
Q. Did-what was his disagreement about the condition of the tract?
A. He said that the tract would work like he said. I mean, he said that ninety percent of the property would work which was completely false. And I told him if it would sit out and dry longer, then, maybe and possibly, it would work in future.
*181 ....
Q. At this juncture, you had no tracts that could be worked, in your opinion, that were in condition to be worked?
A. Correct.
....
Q. Now, how long-how much time did you have left to complete the contract at the points [sic] you billed the sixty-five acres [on the Nevada 411 tract]?
A. 'Til December the 31st.
Q. And what was the date, again, you submitted that invoice on the sixty-five acres?
A. September 9, 2014.
....
Q. Now, at this juncture, being owed $ 123,000.00, what did you decide to do?
A. I decided to terminate the contract because he owed me an excessive amount of money, and he wasn't paying me.
Q. And was still insisting on making you work the tract?
A. He was still insisting that I had to work that tract, and there was no way to operably work the tract, at that time. And, like you said, he owed me $ 123,673.00, and that's a substantial amount of money.
Consequently, on September 10, 2014, Colbey sent notice to Reynolds that he was terminating the contract.
Shortly thereafter, on September 12, 2014, Colbey contacted the Arkansas Forestry Commission "to get another independent party so [he] could try to have proof the tract was too wet to work" and also to determine whether using his heavy equipment on the wet land had caused him to violate the forest industry's best management practices (BMPs) "as far as rutting up the property and all that goes." At Colbey's invitation, Arnold Hameister, the best management practices coordinator at the Arkansas Forestry Commission, examined the Nevada 411 tract on September 17, 2014.
Mr. Hameister agreed that the Nevada 411 tract was "extremely wet and there were areas that were too wet to work," and the condition of the tract warranted Colbey's decision to suspend operations. Mr. Hameister also found, however, that both Colbey and No Way Pulpwood, the company that harvested the timber on the Nevada 411 tract, had violated BMPs during their respective operations.
Regarding Colbey, Mr. Hameister found that an excessive amount of woody debris had been pushed next to the bank of the Little Missouri River, as well as into one of its ephemeral channels. Colbey hired a contractor, Terry Don McKinnon, to remove the debris. In a letter dated November 6, 2014, Mr. Hameister reported he examined the tract a second time and found "[a]ll threats to water quality ... [had] been mitigated."
In the meantime, Reynolds submitted two payments toward the balance owed for Colbey's completed work. The payments totaled $ 51,572, well short of the $ 123,673 that Colbey had billed. Consequently, Colbey filed suit for breach of contract against Reynolds, seeking the remaining balance of $ 72,101 and attorney's fees. Reynolds filed a counterclaim, alleging, as relevant here, that Colbey breached the contract by "[violating] Forestry Best Management Practices on Numerous Occasions." Reynolds further alleged that it "completed on-site preparation and had to remediate Colbey's errors," and sought attorney's fees for Colbey's alleged breaches in accordance with the terms of the contract.
*182 At trial, Reynolds offered a version of the facts that portrayed Reynolds's refusal to pay for Colbey's completed work as a response to Colbey's violation of BMPs. Steve Ham, a contractor who was assigned to oversee Colbey's site preparation, testified that he shut down Colbey's operation on the Nevada 411 tract on September 5, 2014, because he saw Colbey and his crew violating BMPs by pushing debris into the Little Missouri River and another streamside management zone (SMZ) on the land. Mr. Ham claimed that he told Colbey's crew "to get all of the debris out of the SMZs," and "that we were [going to] withhold payment until the debris was cleaned up and everything that was done-had to be corrected." According to Mr. Ham, Colbey's crew refused to clean up the debris, whereupon Reynolds withheld payment for Colbey's completed work.
Mr. Ham also testified that Colbey remained in violation of BMPs even after he remediated the violations that Mr. Hameister identified. Mr. Ham acknowledged that Colbey had hired another contractor to pull the debris from the bank of the Little Missouri River but claimed that Colbey merely burned the debris in the SMZ and left the charred remains in the creek, further violating BMPs. Mr. Ham also suggested that Colbey was responsible for pushing debris into other SMZ areas that were not identified by Mr. Hameister, and Reynolds had to hire a contractor to remediate those additional alleged violations at its own expense.
Finally, Mr. Ham disputed Colbey's claim that the Nevada 411 tract was too wet for site preparation, claiming that there were dry areas that could have supported Colbey's equipment. Mr. Ham suggested that the suitability of the land was demonstrated by the success of the other contractor that Reynolds later hired to finish Colbey's work.
Mr. Reynolds testified that Reynolds did not breach the contract by refusing to pay for Colbey's completed work because under the thirty-day payment term of the contract, none of the payments were due at the time that Colbey gave notice of termination on September 10, 2014. He also disagreed with the amount of acreage that Colbey claimed to have worked on the Nevada 440 tract; therefore, he believed that Reynolds owed only $ 111,212-less than the $ 123,673 that Colbey claimed was owed when he terminated the contract.
Regarding the Nevada 411 tract, Mr. Reynolds claimed that Colbey had only limited discretion to determine whether the tract was too wet to be prepared. According to Mr. Reynolds, Colbey's discretion under the contract is "not just a blank decision that [Colbey] makes and we have no authority or power.... [i]t is something that's done based on knowledge and experience between all parties concerned." Mr. Reynolds further stated that he was troubled by Colbey's decision to work on the Potlach tract from August 22 to August 29 because preparing the lowland tracts was a priority of the site-preparation contract:
[W]e weighted this contract greater [toward] the bottom lands, so it was crucial that you accomplish as much as you could in late July and August, and whatever time was dry after those dates, we want to get as much done, but you would like to be, primarily, complete as much as possible before you get too far into September.
Regarding Colbey's violation of BMPs, Mr. Reynolds testified he received a report from Mr. Ham on September 5, 2014, that Colbey was violating BMPs by pushing debris into SMZs. Mr. Reynolds directed Mr. Ham to stop Colbey's work on that date. Mr. Reynolds also insisted, as Mr. *183 Ham did, that Colbey was in continued violation when he left charred remains of debris in a creek of the Little Missouri River. He stated that although Mr. Hameister found that all of Colbey's violations had been remediated, leaving charred debris in the creek threatened flooding of the entire tract during heavy rains and had to be removed. Consequently, Reynolds hired a contractor to remove the debris.
Mr. Reynolds also claimed that Colbey had violated BMPs by raking debris into a drain on the Nevada 411 tract, and Reynolds, again at its own expense, had to remediate that alleged violation. Mr. Reynolds further testified that he withheld payment for Colbey's completed work because of Colbey's violations of BMPs, and he suggested, as Mr. Ham did, that Reynolds should be compensated for the expenses that it incurred when it removed the debris that Colbey had left behind.
The circuit court, after hearing the above evidence, entered a judgment finding Reynolds in breach of contract. Specifically, the circuit court found that Reynolds "breached the Contract by intentionally refusing to pay [Colbey's] bills for completed site improvement work on various tracts covered by the Contract;" therefore, Colbey "had the right to terminate the Contract when he did on or about September 10, 2014." The circuit court further found that "Teddy Reynolds, acting as Agent for [Reynolds], did tell [Colbey] that he was not going to pay for the completed work after it had been done[.]" The circuit court rejected Reynolds's explanation for withholding payment because Reynolds indicated its intention not to pay as early as August 30, 2014, "before any [BMPs] had been alleged to have occurred on 411(409)." Mr. Reynolds also was not "deemed credible" because he "would not give direct answers on cross examination" and "was evasive and argumentative in answering questions." The circuit court concluded, rather, that Colbey "had the right under the terms and provisions of the Contract to make the determination that tract 411 (409) was too wet to work," and "the evidence show[ed] that tract ... was extremely wet ... [and subject] to excessive rutting" at that time.
The circuit court further found that Colbey "did comply with [BMPs], and if there was a violation, it was corrected." The court noted that "[t]he [SMZs] were placed in a condition which was approved by Arnold Hameister of the Arkansas Forestry Commission[,]" and specifically, "Mr. Hameister ... testified that it was best to burn the debris that was in the SMZ, rather than to remove it." Consequently, the circuit court awarded a judgment in Colbey's favor, awarding him the adjusted unpaid contract balance of $ 62,734 (based on GPS data that Reynolds provided) and 10 percent interest per annum (from September 15, 2014) for a total of $ 79,545. The circuit court also awarded Colbey attorney's fees in the amount of $ 17,000.
Reynolds now argues that the circuit court clearly erred by finding that Reynolds was the first party to materially breach the contract and by failing to award setoffs for expenses that it allegedly incurred to cure Colbey's defective work. Reynolds further argues that the circuit court abused its discretion when it awarded attorney's fees. We find no error and affirm.
II. Standards of Review
The standard of review following a bench trial is whether the trial court's findings are clearly erroneous or clearly against the preponderance of the evidence. Jones v. John B. Dozier Land Tr. , 2017 Ark. App. 23, at 6, 511 S.W.3d 869, 873. "A finding is clearly erroneous when, although *184 there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made." Id. Moreover, "[d]isputed facts and determinations of the credibility of witnesses are within the province of the fact-finder." Id.
"Additionally, although there is no fixed formula [for] determining the computation of attorney's fees, the courts should be guided by recognized factors in making their decision." Chrisco v. Sun Indus. , 304 Ark. 227, 229, 800 S.W.2d 717, 718. Those factors include:
the experience and ability of the attorney, the time and labor required to perform the legal service properly, the amount involved in the case and the results obtained, the novelty and difficulty of the issues involved, the fee customarily charged in the locality for similar legal services, whether the fee is fixed or contingent, the time limitations imposed upon the client or by the circumstances, and the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer.
Id. , 800 S.W.2d at 718-19. Because the circuit court is intimately acquainted with the record and the quality of the legal service rendered, this court "usually recognize[s] the superior perspective of the [circuit court] in assessing the applicable factors." Chrisco , 304 Ark. at 230, 800 S.W.2d at 719. "Accordingly, an award of attorney's fees will not be set aside absent an abuse of discretion by the [circuit] court." Id. This court will not find an abuse of discretion, moreover, unless a circuit court acted "improvidently, thoughtlessly, or without due consideration." Gerber Prods. Co. v. CECO Concrete Constr. , 2017 Ark. App. 568, at 6, 533 S.W.3d 139, 143.
IV. Breach of Contract
Reynolds first asserts that the circuit court clearly erred when it determined that Reynolds was liable for breach of contract by refusing to pay for Colbey's completed work. According to Reynolds, it was excused from making any further payments because Colbey was the first to materially breach the contract on September 5, 2014, when he failed to comply with the forest industry's BMPs. Reynolds further contends, apparently in the alternative, that the circuit court erred in its calculation of damages because Reynolds was entitled to setoffs for "expenses it incurred to cure defective work performed by Colbey."
"When performance of a duty under a contract is contemplated, any nonperformance of that duty is a breach." Spann v. Lovett & Co., Ltd. , 2012 Ark. App. 107, at 21, 389 S.W.3d 77, 93. "Usually, whether a breach of contract occurred is a question of fact." Id. "A 'first breach' by one contracting party may release the other party from its contractual duties if the first breach is material and sufficiently serious." Id. "A material breach is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party." Id. "[A] relatively minor failure of performance on the part of one party," however, "does not justify the other party in seeking to escape any responsibility under the terms of the contract." Id. Under these standards, we affirm the circuit court's judgment.
The circuit court did not clearly err when it determined that Reynolds was the first to materially breach the contract by refusing to pay for the work that Colbey completed on the Nevada 440 tract. Although payment on the invoices was not yet due when Colbey decided to terminate the contract on September 10, 2014, "the anticipatory breach of a contract justifies the other party to treat the contract at an *185 end and permits an action for a breach of the contract." Stocker v. Hall , 269 Ark. 468, 472, 602 S.W.2d 662, 665 (1980). The evidence at trial demonstrated that as early as August 22, 2014, Reynolds conditioned payment for Colbey's work on the Nevada 440 tract on the completion of the Nevada 411 tract, and the threats to withhold payment continued until after Colbey had ceased work on September 7, 2014.
The contract did not entitle Reynolds to condition payment in that manner; instead the contract provided that Colbey had discretion to determine when a tract was unsuitable for site preparation and provided only one deadline-December 31, 2014-for the completion of the work. Further, the evidence amply demonstrated that Colbey did not abuse the discretion that was accorded him under the contract. Other witnesses who observed the condition of the tract in September 2014, including Mr. Hameister, opined that the Nevada 411 tract was too wet. There also was every indication that Reynolds was satisfied with Colbey's work before they disagreed about the condition of the Nevada 411 tract.
The circuit court also did not clearly err by determining that Colbey's violation of BMPs was not a material breach. According to the terms of the contract, Colbey's violation of BMPs, alone, did not excuse Reynolds from paying for Colbey's completed work. Indeed, the contract anticipates that it will continue even after such violations occur, entitling Reynolds to only "postpone operations [under the contract]" and providing that "the period of postponement shall be deemed an extension of the contract period." The contract also allows Colbey to cure any damage from "destructive practices," including, for our purposes here, removing debris from "all weather creeks and streams."
Additionally, a preponderance of the evidence demonstrates that Colbey did not refuse to correct the violations that were attributable to him. First, Colbey's violations of BMPs occurred after Reynolds had threatened to withhold payment on August 22 and 30, 2014, suggesting that Reynolds's allegation that Colbey refused to correct the violations is little more than a post hoc justification for its own breach. There also is no written notice, as required by the contract, to corroborate Mr. Ham's testimony that he ordered Mr. Colbey to suspend operations on the Nevada 411 tract on September 5, 2014. Mr. Ham's testimony that Colbey refused to remove the debris from the SMZs is called into serious doubt, moreover, by the evidence that Colbey himself invited Mr. Hameister to inspect the property, and Mr. Hameister later found that Colbey remediated all of his alleged violations. The circuit court was also free to disbelieve, as it apparently did, Mr. Ham and Mr. Reynolds's testimony that Colbey was responsible for other alleged violations of BMPs on the Nevada 411 tract. Accordingly, for all of these reasons, the circuit court did not clearly err by finding that Reynolds was the first to materially breach the site improvement contract.
Likewise, because Reynolds was the first to materially breach the contract, the circuit court did not err by declining to apply setoffs for the expenses that Reynolds incurred when it hired another contractor to finish preparing the Nevada 411 tract. Setoffs were also not due for Reynolds's remediation of any additional violation of BMPs because, as noted above, Reynolds failed to prove by a preponderance of the evidence that those violations were attributable to Colbey. Therefore, the circuit court's judgment is affirmed.
III. Attorney's Fees
Reynolds next challenges the circuit court's decision awarding attorney's fees to Colbey. Reynolds does not dispute that Colbey is entitled to fees if he is the *186 prevailing party under Arkansas Code Annotated section 16-22-308 or, in that event, that the amount awarded is excessive. Rather, Reynolds appears to assert only that reversal is warranted because the circuit court did not make any specific findings demonstrating the factors it considered in awarding fees. Colbey responds that Reynolds failed to preserve its argument challenging the fee award for appellate review by making an appropriate objection in the circuit court. We agree.
"Failure to object to an award of attorney's fees to the circuit court constitutes a waiver of the objection." Black v. Duffie , 2016 Ark. App. 584, at 32, 508 S.W.3d 40, 59. "To preserve the issue of attorney's fees for review on appeal, an appellant must raise the issue to the circuit court at least by filing a motion to amend the judgment pursuant to Arkansas Rule of Civil Procedure 52(b)." Id. There is no indication in the record that Reynolds challenged-in a postjudgment motion or otherwise-the circuit court's failure to make specific findings when it awarded attorney's fees to Colbey. Therefore, because the issue is not preserved for appellate review, we affirm.
V. Conclusion
The circuit court did not clearly err when it determined that Reynolds was the first to materially breach the site-preparation contract when it refused to pay for Colbey's completed work. Reynolds's challenge to the circuit court's award of attorney's fees, moreover, is not preserved for our review. Accordingly, we affirm the circuit court's judgment in all respects.
Affirmed.
Abramson and Brown, JJ., agree.

The concern was that Colbey's equipment, if used on extremely wet land, would cause "excessive rutting," leading to permanent damage. The concern was warranted. The contract required Colbey to perform the work "with a minimum of two D8 dozers." According to the record, the D8 bulldozer, manufactured by Caterpillar, has an operating weight of over 84,000 pounds. Colbey's smaller equipment, the Caterpillar D5 bulldozer, has an operating weight over 20,000 pounds.

Reynolds disputed the acreage, saying that it took GPS measurements showing that Colbey had prepared only 152 acres. The circuit court used Reynolds's GPS data to make a downward adjustment from the $ 44,716 billed, awarding Colbey $ 39,591 for his work on the Nevada 440 tract.

The parties have variably referred to this tract as the Nevada 409 or the Nevada 411. From this point forward, we refer to it as the Nevada 411.

Land that is treated with herbicide takes longer to dry because the herbicide eradicates the plants, trees, and other vegetation that absorb the water in the soil.