DAVID M. GLOVER, Judge
Appellee City of Mountain Home, Arkansas ("Mountain Home" or "City"), provides water to appellant Northeast Public Water Authority of the State of Arkansas ("NPWA" or "Buyer") pursuant to a 2012 wholesale water purchase agreement ("contract"). This 2012 contract replaced the thirty-year contract that had been in effect since 1982. On November 4, 2015, NPWA filed a complaint in the Baxter County Circuit Court against Mountain Home, alleging Mountain Home breached the 2012 contract by improperly calculating the rates charged to NPWA. Mountain Home denied breaching the contract, asserting the contract spoke for itself and contending the parties had established through both the previous contract and the present contract a price calculation that had become established and agreed to by the parties.
At issue is paragraph 2 of the contract, which sets the purchase price for the water NPWA buys from Mountain Home and provides as follows:
2. Water Purchase Price. City shall sell all potable water purchased by Buyer hereunder at a price per thousand gallons that is equal to Buyer's share of City's actual expenses incurred in connection with the City's production and delivery of the water to the Buyer which expenses include, without limitation, costs associated with the City's water supply source, plant, transmission and telemetry cost and expenses, treatment costs, distribution line costs, pumping and related electrical expenses, general and administrative expenses and general and administrative expenses associated with the production of water, plus , a sum which equals 10% of the foregoing expenses (collectively the "Water Purchase Price"). City agrees to provide Buyer with access to its books and records in order to quantify the Water Purchase Price.
(Emphasis in original.)
In a February 21, 2017 pretrial conference, NPWA and Mountain Home both asserted paragraph 2 was not ambiguous, and both parties submitted proposed findings of fact and conclusions of law, which the circuit court treated as pretrial briefs.
Hearing
A hearing was held on March 2, 2017. NPWA contended it was only obligated to pay its share of Mountain Home's actual expenses incurred in connection with the production and delivery of water to NPWA, and instead, Mountain Home was charging NPWA a percentage of all the tanks, all the distribution lines, all the bond costs, and all other associated costs *439 that were not related to NPWA's pumping station and the water-treatment plant. Mountain Home argued the contract provided two components of permissible general administrative expenses-general administrative expenses and general administrative expenses associated with the production of water. Mountain Home pointed out that although the 2012 contract was a new contract, it was, in essence, a continuation of the previous water-supply contract entered into in 1982; there had been previous disputes about the price of the water, but the contract formula had been the same for many years; and NPWA's attorney had drafted the contract.
Gerry Lance, NPWA manager, testified he was familiar with the contract and agreed there had been a previous contract between the two parties. He explained NPWA purchases all its water from Mountain Home, which bills NPWA each month. He said Mountain Home typically raised rates annually, although he admitted there was "a year or two" when there was not a rate increase, and NPWA is currently paying $3.91 per 1,000 gallons of water. Lance testified NPWA obtained 100% of its water from Mountain Home's water-treatment plant, using a line that comes directly from the treatment plant and ties straight into NPWA's pump station, which is approximately 100 feet from Mountain Home's treatment plant. Lance testified that if expenses unrelated to the water-treatment-plant expenses were taken out, the cost of NPWA's water would be drastically reduced, and it was apparent Mountain Home was charging NPWA not just expenses and operating costs related to the treatment plant but rather to its entire system. Lance conceded NPWA was responsible for its pro rata share of the maintenance of the Wallace Knob tank, the storage tank closest to its meter and to the water-treatment plant. Lance also complained that while NPWA received a rate increase in the current year, to his knowledge Mountain Home had not increased the rates of its own customers.
On cross-examination, Lance further conceded the contract stated both "general and administrative expenses" and "general and administrative expenses associated with the production of water," although, as he testified, he believed that wording was a typographical error. Lance agreed the contract was prepared by Heartsill Ragon, NPWA's attorney, and he (Lance) had reviewed the contract before it was signed. Lance acknowledged the water-treatment plant did not operate twenty-four hours a day, and when it was not operating, NPWA drew water from the system; however, he believed NPWA drew from the Wallace Knob tank, the water-storage tank closest to its meter, not the Southwest tank, another of Mountain Home's water-storage tanks. Lance believed if NPWA was using the system that it should pay its percentage share (estimated by Lance to be 1.4% of the total cost) for that use up to the Wallace Knob tank. Lance admitted Mountain Home was obligated under the contract to maintain what was known as the Days Inn tank, but that tank could not be used as part of NPWA's system.
On redirect examination, Lance reiterated his belief that when NPWA was not receiving water from the treatment plant, it was coming from the Wallace Knob tank, not from the other two tanks in Mountain Home's water system. He explained NPWA could not use the Days Inn storage tank because NPWA's water pressure is higher than Mountain Home's water pressure.
Civil engineer Ken Cotter, on behalf of NPWA, calculated that 1.4% of Mountain Home's water system was utilized in providing water from the treatment plant to the Wallace Knob tank. Cotter believed that once the storage capacity of the main *440 water system was consumed, NPWA's water would come from the Wallace Knob tank, as it was the tank in closest proximity to NPWA. Cotter changed his opinion on cross-examination after learning there was an electronic valve controlling the Wallace Knob tank.
Certified public accountant Brian Haas testified that NPWA was presently being charged for a percentage of the entire Mountain Home water system; however, it was his opinion that general and administrative expenses were not part of water-delivery costs. Haas was of the opinion the contract language stating both "general and administrative expenses" and "general and administrative expenses associated with the production of water" was a typographical error; however, he conceded that general and administrative expenses and general and administrative expenses associated with the production of water could be two separate, different items. Nevertheless, it was Haas's opinion that system expenses were not included in the contract.
Kirby Roland, a civil engineer with Garver Engineers since 1976, testified he had worked with Mountain Home and its water system since 1978 and had constructed "a number" of master plans for Mountain Home and its water system. He described Mountain Home's water system as a "batch system," which means that the water plant would turn on only when it was signaled to do so from a source (the control tank). According to Roland, the Wallace Knob tank was originally the control tank, but when the original plant was expanded in 1984 to double its capacity to an 8,000,000-gallon-per-day plant, a new tank, the Southwest tank, was added to the system and became the control tank. The Southwest tank is located on the other side of Mountain Home from the Wallace Knob tank, although both tanks are at 960 feet above sea level at overflow. Roland explained that when the water plant is operating, NPWA receives its water from the treatment facility, but when the plant is not operating, water comes from the Southwest tank, except in certain situations when the Southwest tank is low, and then the valve would open at Wallace Knob. Roland explained that the Southwest tank, as the control tank, is the one to signal the water plant to resume operating; that if the Wallace Knob tank filled before the Southwest tank was full, an electronic valve will close the Wallace Knob tank to prevent overflow; and that the electronic valve will not open again until the water-hydraulic radiant had dropped four to five feet below 960. Per Roland's explanation, during the time the electronic valve closes off the Wallace Knob tank, the only place in the entire 960-based system that water can come from is the Southwest tank until the Southwest tank reaches the hydraulic rating of 955, and the valve begins to open; if the Southwest tank continues to drop, the pumps at the water plant turn back on and refill the system. Roland testified Lance was incorrect that NPWA's water comes from the Wallace Knob tank when the water plant is not running because the Southwest tank, as the control tank, was the operating tank. He explained it is only in certain situations, when the Southwest tank is low, that the electronic valve opens at the Wallace Knob tank. Therefore, Roland explained, NPWA uses the water system, including the Southwest tank. Roland testified there was no dispute that NPWA is paying a percentage based on its total usage of water of the entire operating costs of the Mountain Home water system, which included the treatment plant, tanks, distribution lines, and pump stations.
Alma Clark, the director of Mountain Home's water department, testified the water-treatment plant is offline on average six to seven hours a day, at which time NPWA draws from the water system.
*441 Clark said NPWA's attorney drafted the 2012 contract, and while the language was not identical to the 1982 contract (the term of the contract was shortened from thirty years to twenty years and NPWA was authorized to draw a greater amount of water), Clark told the Mountain Home City Council the contract was the same as the previous contract except for the length of the contract. Clark accused NPWA of attempting to pick and choose what charges it wanted to pay; agreed Mountain Home was charging NPWA its pro rata portion of all the expenses associated with the upkeep of the water system; and disagreed Mountain Home had breached the contract.
Order
The circuit court entered an order on July 27, 2017, finding that NPWA had failed to meet its burden of proof on the issue of contract interpretation and that the City had not breached the contract. In its order, the circuit court found Mountain Home and NPWA's predecessor (Mountain Home Northeast Water Association, Inc.) had entered into a thirty-year wholesale water-purchase agreement in 1982; the monthly payment formula set forth in the 1982 agreement was similar to what was set out in the 2012 contract; the 1982 agreement was performed for a term of thirty years; disputes had arisen over the terms of the 1982 agreement concerning rate calculations paid by NPWA's predecessor, but the annual rate calculations continued to be paid; a new contract was entered into in 2012; the 2012 contract was drafted by NPWA's attorney; Mountain Home's City Council meeting approved the 2012 contract, and it was signed by Mountain Home's mayor and NPWA's president; the minutes of the Mountain Home City Council meeting reflected that the only changes in the 2012 contract were the length of the contract and the allowance for NPWA to draw more water; and while Mountain Home believed the 2012 contract did not change the methodology for NPWA's annual rate calculation, NPWA believed that only those general and administrative expenses associated with the production of water should be included in the annual rate calculation. The circuit court found that NPWA is connected to Mountain Home's water system, explaining how the storage tanks operate when the water plant is not operating and how the water-distribution system is utilized for NPWA's water when the water plant is not in operation. The circuit court found that the 2012 contract was valid and not ambiguous; that the words "general and administrative expenses" are in addition to the "general and administrative expenses associated with the production of water"; that "general and administrative expenses" is a broad phrase; that since NPWA draws from the City's water system, NPWA's portion of the "general and administrative expenses" for the entire City water system may be included in the annual rate calculation pursuant to the terms of the 2012 contract; and that the annual rate calculation is appropriate and consistent with the 2012 contract. The circuit court found, "[B]ased on the language for the 2012 Agreement, there can be no genuine dispute that the phrase 'actual expenses incurred in connection with the City's production and delivery of water' was expressly agreed by the parties to include 'general and administrative expenses' in addition to 'general and administrative expenses associated with the production of water.' " The circuit court additionally concluded the parties' course of performance over the years of the 1982 agreement and the 2012 agreement indicated its construction of the 2012 contract was further warranted.
Standard of Review
In civil bench trials, the standard of review on appeal is whether the circuit *442 court's findings were clearly erroneous or clearly against a preponderance of the evidence. Peregrine Trading, LLC v. Rowe , 2018 Ark. App. 176, 546 S.W.3d 518. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a firm conviction that a mistake has been committed. Id. Facts in dispute and determinations of credibility are solely within the province of the fact-finder. Id. The determination of whether an ambiguity exists is ordinarily a question of law to be resolved by the court; when a contract is not ambiguous, its construction and legal effect are questions of law for the court to determine; the court must construe the writing in accordance with the plain meaning of the language employed. Yancy v. Hunt , 2018 Ark. App. 195, 547 S.W.3d 116 (citing Spann v. Lovett & Co. , 2012 Ark. App. 107, 389 S.W.3d 77 ). When the issue of ambiguity may be resolved by reviewing the language of the contract itself, it is the responsibility of the circuit court as a matter of law to make such a determination. Id. A circuit court's conclusion on a question of law is reviewed de novo and is given no deference on appeal. Murphy v. City of West Memphis , 352 Ark. 315, 101 S.W.3d 221 (2003).
Discussion
On appeal, NPWA focuses on the portion of paragraph 2 that states the price per thousand gallons of water "is equal to Buyer's share of City's actual expenses incurred in connection with the City's production and delivery of the water to the Buyer. " (Emphasis added.) It argues the clear and unambiguous language in the contract allows NPWA to be charged only the actual expenses incurred in connection with the production and delivery of water to NPWA, the expenses of the rest of the Mountain Home water system are not necessary to comply with Mountain Home's contractual obligation to produce and deliver water to NPWA; therefore, Mountain Home has breached the contract by charging NPWA for general and administrative expenses associated with the entire water system.
We do not agree with NPWA's contentions. When parties express their intentions in a written instrument in clear and unambiguous language, the circuit court must construe the writing in accordance with the plain meaning of the language employed, considering the sense and meaning of the parties' words as they are taken and understood in their plain and ordinary meaning. Kraft v. Limestone Partners, LLC , 2017 Ark. App. 315, 522 S.W.3d 150. In making its argument, NPWA ignores the additional language in paragraph 2 defining the City's actual expenses incurred in connection with the production and delivery of water to NPWA. The contract, drafted by NPWA's attorney, specifically defines actual expenses to include, without limitation, "costs associated with the City's water supply source, plant, transmission and telemetry cost and expenses, treatment costs, distribution line costs, pumping and related electrical expenses, general and administrative expenses and general and administrative expenses associated with the production of water , plus a sum which is equal to 10% of the foregoing expenses." (Emphasis added.) The circuit court found that this wording in the 2012 contract was not ambiguous; that "general and administrative expenses" were separate from the "general and administrative expenses associated with the production of water"; and that, because "general and administrative expenses" is a broad phrase, and since NPWA draws from the City's water system, as evidenced by Kirby Roland's testimony, NPWA could be charged a portion of the "general and administrative expenses" for the entire City water system *443 in the annual rate calculation pursuant to the terms of the 2012 contract. The circuit court found that the phrase "actual expenses incurred in connection with the City's production and delivery of water" was expressly agreed by the parties to include both "general and administrative expenses" in addition to "general and administrative expenses associated with the production of water." Giving the words of the contract their plain and ordinary meaning, the circuit court correctly construed paragraph 2 of the contract to also include the general and administrative expenses of the City's water plant in NPWA's rate calculation. A court cannot make a contract for parties but can only construe and enforce the contract the parties have made. Kraft, supra. In the present case, the circuit court did just that-construed and enforced the contract made by the parties.
Affirmed.
Gladwin and Whiteaker, JJ., agree.